Scott A. Edelman (SE-5247)
Daniel M. Perry (DP-6966)
MILBANK, TWEED, HADLEY & McCLOY, LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel for Compass Financial Partners LLC and*
*Compass USA SPE LLC*

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CCM PATHFINDER POMPANO BAY, ) LLC ) | Case No:  08 Civ. 5258 (JSR) |
| ) | |
| Plaintiff, ) | |
| ) | |
| -against- ) | **DECLARATION OF DANIEL M. PERRY** |
| ) | **REGARDING SUPPLEMENTAL REPLY** |
| COMPASS FINANCIAL PARTNERS ) | **IN SUPPORT OF COMPASS'S MOTION** |
| LLC and COMPASS USA SPE LLC, ) | **FOR ORDER TRANSFERRING VENUE** |
| ) | **TO THE UNITED STATES DISTRICT** |
| Defendants. ) | **COURT FOR THE DISTRICT OF** |
| | **NEVADA** |

I, Daniel M. Perry, declare as follows:

1.      I am duly licensed to practice law in the State of New York and in the United States District Court for the Southern District of New York.  I am a partner at the law firm of Milbank, Tweed, Hadley & McCloy LLP, counsel for Compass USA SPE LLC, and its servicer, Compass Financial Partners LLC (together, "Compass").  I submit this declaration in support of Compass's Motion for Transfer of Venue to United States District Court for the District of Nevada.  I have personal knowledge of the facts stated in this declaration and, if called upon to do so, would testify competently thereto at trial.

2.      Attached hereto as Exhibit A is a true and correct copy of the Transcript of Proceedings before the Honorable Robert C. Jones, United States District Judge for the District of Nevada, on August 11, 2008, in Case No. 2:07-cv-00892-RCJ-GWF.

3.      Attached hereto as Exhibit B is a true and correct copy of the proposed settlement agreement submitted to the Court in Case No. 2:07-cv-00892-RCJ-GWF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of August, 2008 in New York, New York.

Dan Perry/GW

Daniel M. Perry

# EXHIBIT A

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEVADA

3    LAS VEGAS, NEVADA

4    In re:  USA COMMERCIAL MORTGAGE   )
         COMPANY.                          )
5                                          )  Case No.
                                           )  2:07-CV-892-RCJ-GWF
6    _____)
     3685 SAN FERNANDO LENDERS, LLC,  )
7    et al.,                          )
                                      )
8              Plaintiffs,            )
                                      )
9         vs.                         )  Case No.
                                      )  3:07-CV-241-RCJ-GWF
10   COMPASS USA SPE LLC, et al.,     )
                                      )
11             Defendants.            )
     _____)

12

13                TRANSCRIPT OF PROCEEDINGS
                            OF
14                    HEARING RE:
     MOTION FOR LEAVE TO FILE THIRD-AMENDED CLASS-ACTION COMPLAINT
15                          AND
        APPOINTING RECEIVER FOR CLASS MEMBER LOAN INTERESTS
16                          AND
        PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT
17                          AND
     AUTHORIZATION OF DISTRIBUTION OF NOTICE OF CLASS SETTLEMENT
18                          AND
           SETTING SCHEDULE/FINAL APPROVAL
19                      VOLUME 1
          BEFORE THE HONORABLE ROBERT C. JONES
20             UNITED STATES DISTRICT JUDGE

21              Monday, August 11, 2008

22

23   Court Recorder:       Araceli Bareng

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

```
 1    APPEARANCES:

 2    For the Receiver,         TERRY A. COFFING, ESQ.
      Thomas Grimmett:          Marquis & Aurbach
 3                              10001 Park Run Drive
                                Las Vegas, Nevada 89145
 4
      For Certain Plaintiff     RICHARD R. MAINLAND, ESQ.
 5    LLCs and Special          Fulbright & Jaworski, LLP
      Counsel for the           555 South Flower Street
 6    Receiver:                 Forty-First Floor
                                Los Angeles, California 90071
 7
                                MARK WEIBEL, ESQ.
 8                              NORLYNN B. PRICE, ESQ.
                                Fulbright & Jaworski, LLP
 9                              2200 Ross Avenue
                                Suite 2800
10                              Dallas, Texas 75201

11    For Certain Direct        G. MARK ALBRIGHT, ESQ.
      Lenders:                  SPENCER M JUDD, ESQ.
12                              Albright, Stoddard, Warnick & Albright
                                801 South Rancho Drive
13                              Suite D-4
                                Las Vegas, Nevada 89106
14
      For the Platinum          MITCHEL J. LANGBERG, ESQ.
15    Property Entities         Brownstein, Hyatt, Farber, Schreck, LLP
      and Various Direct        100 City Parkway
16    Lenders:                  Suite 1600
                                Las Vegas, Nevada 89106
17
      For Debt Acquisition      DEAN T. KIRBY, JR., ESQ.
18    Company of America        Kirby & McGuinn, P.C.
      and Eagle Investment      600 B Street
19    Partners:                 Suite 1950
                                San Diego, California 92101
20
      For CMM Pathfinder:       JOANNA S. KISHNER, ESQ.
21                              DLA Piper US, LLP
                                3960 Howard Hughes Parkway
22                              Suite 400
                                Las Vegas, Nevada 89169
23
                                BETTY M. SHUMENER, ESQ.
24                              DLA Piper US, LLP
                                550 South Hope Street
25                              Suite 2300
```

3

```
 1   APPEARANCES (Cont.):

 2   For the Compass          ROBERT J. MOORE, ESQ.
     Entities:                LINDA DAKIN-GRIMM, ESQ.
 3                            Milbank, Tweed, Hadley & McCloy, LLP
                              601 South Figueroa Street
 4                            Thirtieth Floor
                              Los Angeles, California 90017
 5
                              JOSEPH P. HARDY, ESQ.
 6                            Bullivant Houser Bailey, P.C.
                              3883 Howard Hughes Parkway
 7                            Suite 550
                              Las Vegas, Nevada 89169
 8
     For the Jones Vargas     JANET L. CHUBB, ESQ.
 9   Direct Lenders:          Jones Vargas
                              100 West Liberty Street
10                            Twelfth Floor
                              Reno, Nevada 89501
11
     For Silar Advisors,      JONATHAN D. FORSTOT, ESQ.
12   LP:                      Thacher, Proffitt & Wood, LLP
                              2 World Financial Center
13                            New York, New York 10281

14                            RANDOLPH L. HOWARD, ESQ.
                              Kolesar & Leatham, Chtd.
15                            3320 West Sahara Avenue
                              Suite 380
16                            Las Vegas, Nevada 89102

17   For the Direct Lender,   SAMUEL A. SCHWARTZ, ESQ.
     Shirley Schwartz:        The Schwartz Law Firm, Inc.
18                            626 South Third Street
                              Las Vegas, Nevada 89101
19
     For Sierra Liquidity     DAVID E. BRUGGENWIRTH, ESQ.
20   Fund, LLC:               Wilde Hansen, LLP
                              208 South Jones Boulevard
21                            Las Vegas, Nevada 89107

22   For Certain Plaintiffs:  STANLEY W. PARRY, ESQ.
                              Ballard, Spahr, Andrews & Ingersoll, LLP
23                            300 South Fourth Street
                              Suite 1201
24                            Las Vegas, Nevada 89101

25
```

4

```
1    APPEARANCES (Cont.):

2    Also Present:           THOMAS GRIMMETT
                             Receiver
3
                             JAMES RILEY
4                            Manager
                             Sierra Liquidity Fund, LLC
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

1        (Court convened at 11:06:40 a.m.)

2            THE CLERK:  All rise.

3        (Colloquy not on the record.)

4            THE COURT:  Thank you and good morning.  Please be

5    seated.

6        (Colloquy not on the record.)

7            THE COURT:  Welcome to the United States District

8    Court for the District of Nevada.  We're here in the matter of

9    San Fernando Lenders versus Compass, et al.

10        Let's start with appearances of counsel, please, and I'll

11    wait to take any appearances of pro se persons who want to

12    appear.

13        In fact, maybe I'll ask Madam Clerk, please, to circulate

14    a yellow pad, rather than taking any appearances of persons who

15    want to appear.  You may note your appearance if you've already

16    filed a response or a letter, please.

17        And if you want your appearance recorded for the record as

18    opposed to the settlement, I'll ask Madam Clerk simply, please,

19    to circulate the pad, and you can sign in.

20        And that will be the record of your appearance if you're

21    not represented here by an attorney, but I will call, please,

22    as we start for appearances by all counsel.

23        Good morning.

24            MR. COFFING:  Good morning, your Honor.

25    Terry Coffing on behalf of the receiver.  Mr. Grimmett is

1    present in the courtroom.

2              THE COURT:  Thank you.

3              MR. MAINLAND:  Good morning, your Honor.

4    Richard Mainland of Fulbright & Jaworski for certain

5    Plaintiff LLCs and special counsel for the receiver.

6              THE COURT:  Thank you.

7              MR. ALBRIGHT:  Good morning, your Honor.

8              THE COURT:  Good morning.

9              MR. ALBRIGHT:  Mark Albright on behalf of certain

10   direct lenders.

11             THE COURT:  Um-h'm.

12             MR. JUDD:  Spencer Judd on behalf of direct lenders.

13             MR. LANGBERG:  Good morning, your Honor.

14   Mitchell Langberg on behalf of the Platinum Properties entities

15   and various direct lenders identified in Document No. 663.

16             MR. WEIBEL:  Mark Weibel with Fulbright & Jaworski on

17   behalf of the plaintiffs.

18             MR. KIRBY:  Dean Kirby, Kirby & McGuinn, for

19   Debt Acquisition Company of America and for Eagle Investment

20   Partners.

21             MS. KISHNER:  Joanna Kishner of DLA Piper.  I have

22   with me Betty Shumener who has a pro hac vice application

23   pending on behalf of Lender CCM Pathfinder.

24             THE COURT:  Thank you.

25             MR. MOORE:  Your Honor, Robert Moore and

1    Linda Dakin-Grimm of Milbank, Tweed, Hadley & McCloy on behalf

2    of the Compass entities together with Joe Hardy of the

3    Bullivant firm who serves as our Las Vegas counsel.

4            MS. CHUBB:  Good morning, your Honor.

5            THE COURT:  Good morning.

6            MS. CHUBB:  Janet Chubb for the Jones Vargas direct

7    lenders.

8            THE COURT:  Ms. Chubb.

9            MR. FORSTOT:  Good morning, your Honor.

10   Jonathan Forstot on behalf of Silar and the --

11           THE COURT RECORDER:  I'm sorry.  Please move

12   closer --

13           THE COURT:  A little bit louder --

14           THE COURT RECORDER:  -- to the microphone.

15           THE COURT:  -- to the --

16           THE COURT RECORDER:  Thank you.

17           MR. FORSTOT:  I'm sorry.

18           THE COURT:  -- microphone, please.

19           MR. FORSTOT:  Jonathan Forstot.  Good morning,

20   your Honor.

21           THE COURT:  Good morning.

22           MR. FORSTOT:  I'm here on behalf of Silar, and I'm

23   here with my co-counsel, Randy Howard.

24           THE COURT:  Thank you.

25           MR. SCHWARTZ:  Good morning, your Honor.

1    Sam Schwartz on behalf of the direct lender, Shirley Schwartz.

2            THE COURT:  Thank you.

3        (Colloquy not on the record.)

4            THE COURT:  Again, if we have persons here --

5    Counsel, please.

6            MR. BRUGGENWIRTH:  Good morning, your Honor.

7    David Bruggenwirth from Wilde Hansen here on behalf of

8    Sierra Liquidity and with Jim Riley.

9            THE COURT:  Thank you.

10           MS. PRICE:  Your Honor, Norlynn Price from

11   Fulbright & Jaworski along with Mr. Mainland here on behalf of

12   certain LLCs and as special counsel to the receiver.

13       (Colloquy not on the record.)

14           THE COURT:  Thank you.

15           MR. PARRY:  And Stanley Parry with Ballard, Spahr

16   here on behalf of certain plaintiffs.

17           THE COURT:  Thank you.

18       Again, I won't take the appearance, presently.  I may

19   allow some of you to address the Court.  But if you simply want

20   to enter your appearance and have it on the record that you

21   appeared here in opposition to the settlement, this is a time

22   to be heard for putative potential class members.  That's one

23   of the questions here, and, therefore, I'll let you enter your

24   appearance by signing in on the pad.

25       You don't have to sign in for the record.  But if you want

9

1   your name noted for the record in opposition to the settlement,

2   I welcome your signing in in that respect.

3        Let me give you a little bit of a road map if I can,

4   please.  We have in front of us a tentative certification of a

5   class in this action, previously, separate several consolidated

6   separate actions pending before the federal district court.

7        We have pending the question of a certification of a class

8   and for settlement purposes and then, of course, a proposed

9   settlement as well.

10       I've read all of the pleadings.  I'm sure oral argument

11  will be very helpful to me, and I've also read for the record

12  all of the letter oppositions received from putative class

13  members.

14       Putative means potential alleged class members.  In other

15  words, I haven't certified a class, yet.  I've only

16  conditionally certified a class, so that a notice of settlement

17  can be circulated.  When I use the word "putative", it means

18  you're an alleged class member.  The Court hasn't so ruled,

19  yet.

20       And I've read all of those letters, and I do want and

21  subject to objection of counsel to enter them in the record.

22  They have been scanned in by my administrative assistant and,

23  accordingly, are available for adoption into the record if

24  there is no objection.  But, of course, I'll entertain your

25  objections, otherwise.

1          Again, I've read all of the pleadings.  The problem that I

2   see here is the fact that we have all of the letters that I

3   have received from putative --

4          (Cellular telephone ringing at 11:11:42 a.m.)

5          THE COURT:  Dear.  I'm sorry.  If you could remove

6   that telephone from the courtroom, please.  I apologize.  Could

7   you just whoever has it -- I'm not going to sanction you, but

8   if you'll just remove the phone from the courtroom, please.

9          (Colloquy not on the record.)

10          THE COURT:  I do apologize.  Hand it down to the CSO,

11   so that he might hold it or remove it.  Thank you so much.

12          I apologize.  Stream of thought here, you know.

13          UNIDENTIFIED SPEAKER:  (Indiscernible) problem.

14          THE COURT:  My initial reaction is that there is a

15   problem with approval of this settlement class where all of the

16   letters that I have received are in opposition from putative

17   class members.  I don't have any in approval.

18          Of course, I do have some substantial ones represented by

19   counsel and including Compass who holds direct-lender interests

20   in favor of a settlement, and I want to hear about those and

21   receive those, but the big problem is that we have so many who

22   are opposed to it.

23          I'm not sure that I see anything wrong at this juncture --

24   and, again, I'm willing to listen to argument -- with the

25   certification of a class.

```
 1        The problem with the class certification is that I think

 2   maybe the proposed classes aren't finely defined enough at this

 3   juncture.

 4        In other words, the proposed settlement, for example, is

 5   very broad and sweeping.  It reaches a settlement, a

 6   dollar-figure settlement, on these fees and then allocates them

 7   simply across the board.

 8        And as pointed out in some of the oppositions, there are

 9   differing factual scenarios which not only is an argument

10   against certification of this one single class, but it may be

11   arguments against adoption under a fairness concept with

12   respect to what may be subclasses.

13        So, for example, the documentation regarding the ability

14   to collect such fees varies from promissory note to promissory

15   note and from direct lender to direct lender, in other words,

16   the obligation for fees.

17        Some of the notes say with respect to application of the

18   default interest and other charges for default that they must

19   be allocated first and received first out of any proceeds from

20   a borrower.

21        On the other hand, other notes give that discretion to the

22   lender.  They say at the lender's discretion any payments

23   should be applied first to default or default interest, so that

24   may be a reason to distinguish between notes and in the amount

25   of settlement or whether to settle with respect to any
```

1    particular note.

2         It also offers the difference in servicing fees obligated

3    by a particular direct lender may vary depending on their

4    agreement, their servicing-fee agreement, with the original

5    debtor, Commercial.

6         For that reason, there may be problems with certification

7    of a class overall, but I don't see problems with certifying a

8    class or classes in the case on the face of it.

9         (Colloquy not on the record.)

10        THE COURT:  Again, the main issue will be whether or

11   not we need a proposal of subclasses, a little bit more fine,

12   less-grainy photo of the total circumstances that we've

13   identified.

14        And I welcome your oral comments on that whether or not we

15   should proceed with certification whether or not we settle with

16   Defendant Compass or whether we should ask for a little bit

17   greater delineation of classes and subclasses which is

18   permitted under Rule 23.

19        If there are not common issues and numerosity, for

20   example, especially common issues with respect to an overall

21   class, Rule 23 permits the designation of subclasses for which

22   there is commonality of issues of law and fact with respect to

23   the designated subclass, so that may be a curing for class

24   certification.

25        Overall, I don't see so far subject to your oral arguments

13

1    a problem with certifying a class or class actions in this

2    case.  I do see a problem, however, with the settlement.

3         And the main problem is that we don't have any real

4    support from direct lenders for being swept up in a class

5    action and submitting to this particular class action.

6         As I have already admonished counsel and the various

7    parties who have appeared heretofore, your real out here is the

8    mediation because Compass is certainly right in some of their

9    pleadings.

10        You know, so far, we have lots of objecting parties who

11   have not incurred the cost.  Outside of their prior attempt to

12   join together in the LLCs, they have not incurred the cost

13   appropriate for someone who wants to defend appropriately in a

14   federal action and/or prosecute a federal action against

15   Compass.  The class action gives the ability to do that.

16        Previously, the LLCs were seen as the tool or the

17   structure available to assess people with an appropriate share

18   of a litigating cost with Compass and with others.  The Court

19   has struck that down appropriately I believe.

20        Of course, some of you may strongly disagree, but

21   appropriately I believe because the LLCs were taking advantage

22   of the circumstances of the debtor and Compass and their own

23   clientele.

24        But for that purpose, the Court has designated a receiver,

25   and you have very strong counsel for the receiver.  I continued

1    the counsel chosen by Ms. Cangelosi as counsel for the

2    receiver, the Jaworski firm, who is a very reputable firm, a

3    nationwide firm, and who has a very strong interest in

4    defending direct-lenders' positions let alone the LLC positions

5    against Compass.

6         So you have a very strong, very able firm that has already

7    spent millions of dollars in fees.  You can bet Compass has,

8    too, and a lot of complaints in these letters about the lawyers

9    getting the lion's share, and that's going to happen.

10        That's just facts of life.  When you submit the matter to

11   a federal court or a bankruptcy court jurisdiction, the matter

12   is going to incur substantial fees in order to get it resolved.

13        We have lots of parties.  We have lots of lawyers

14   involved.  And the longer it goes on, there are going to be

15   substantial fees that come from those who are involved in the

16   litigation.

17        So to the extent you seek a mediated settlement short of

18   trial, you can bet you're going to save your ownself lots of

19   dollars.

20        You may well economically decide that it is better to

21   spend those dollars than to consent to a settlement that you

22   don't think is fair, and that is a judgment that the Court

23   fully respects and, largely, I intend to follow.

24        If the parties arguing here cannot overcome the objections

25   by direct lenders as expressed in these letters, I'm not going

1    to approve the settlement.

2        It is you for whom the receiver and Jaworski speaks, and

3    you have every right to tell them we don't want this

4    settlement.

5        And if that is the consensus, you can bet I'm going to

6    echo that to Jaworski, and Jaworski will take their marching

7    orders, and those are clearly what they should follow.

8        But the point I'm trying to make is that a mediation

9    whatever the result is is ultimately your very best route to a

10   resolution of getting the recovery of any funds.

11       You're simply not going to prevail on any request for the

12   Court just to walk away from the dispute and debar Compass from

13   handling these notes.  That's just not going to happen.

14       They have rights just like every other party that the

15   Court is intent on protecting and will protect as well as the

16   direct-lender rights that I definitely want to protect and have

17   expressed a desire to protect.

18       So Jaworski is that representative and potential

19   representative if I do ultimately certify a class.  They are a

20   representative for the LLCs and the receiver for the LLCs.

21   And, potentially, if the Court certifies a class, they are the

22   representative across the board.

23       And that is the tool that the Court has adopted as a

24   substitute for LLCs which I just could not stomach nor could I

25   countenance along the terms that were proposed in the transfer

1    of assets from direct lenders to the LLCs.

2         So you have a tool.  That is a potential class action, and

3    you have a very strong representative, a very strong law firm

4    who will based upon whatever marching orders you give it will,

5    of course, pursue the interest of the majority of those who

6    have an interest.

7         So with that background, again, I have read all the

8    pleadings, and I have given you a little bit of a predilection

9    about how the Court may rule on these motions, but I'm sure

10   your oral arguments can have effect upon the Court's tentative

11   decisions after reading the pleadings.

12        So I welcome, first, an initial presentation for a

13   proposal for adopting this settlement and certification of the

14   class and then, of course, opposition and responses and

15   reactions by the receiver and the Jaworski firm.

16        Please.

17        (Colloquy not on the record.)

18             MR. COFFING:  Good morning, your Honor.

19   Terry Coffing --

20             THE COURT:  Good morning.

21             MR. COFFING:  -- on behalf of the receiver.  This is

22   our motion to approve the settlement, and I wanted to address

23   the settlement terms first.

24        And my colleague, Mr. Mainland, will address the finer

25   points of the actual class action I guess subject to some

1    revision based upon your comments.

2        Your Honor, we clearly heard you on June 2nd that when you

3    ordered these parties to mediation, and the words you used with

4    it was your "last and best hope", and you've echoed that today.

5        It was that with that understanding that the receiver went

6    into the mediation to get the best settlement -- and I

7    emphasize the term "settlement" -- out of the process.

8        And over four contentious days of mediation and the

9    subsequent two weeks of fine-tuning, I firmly believe as does

10   the receiver that we have the absolute best settlement that

11   could be "extracted" -- and I'll use that word politely -- from

12   Compass.

13       This settlement is the line in the sand.  It is the point

14   at which the parties must either accept or go on fighting, and

15   the settlement comes with a price, and the monetary terms have

16   been outlined before this Court, and that price buys certainty.

17       A rejection of the settlement creates a great deal

18   of uncertainty that really cannot be quantified

19   completely.

20           THE COURT:  Maybe I can ask a few quantifying

21   questions.  For example, assuming the Court doesn't approve the

22   settlement, assuming that I certify a class or don't certify a

23   class, Jaworski is prepared or may be prepared with appropriate

24   ability to be assured of the recovery of fees to proceed to a

25   trial.

1          Jaworski has already done substantial discovery, has

2     previously represented the LLCs in these cases, and is there

3     any threat or potential that we would lose Jaworski if I don't

4     approve a settlement?

5          And then the second question in quantifying the

6     characterization you have given is what is the accrual of fees

7     already by Jaworski.

8               MR. COFFING:  I believe the accrual of fees by the

9     Jaworski firm is in the neighborhood of $4,000,000, your Honor,

10    and the Jaworski firm, obviously, subject to today's -- I

11    haven't talked to them about your comments today.

12         They have expressed a desire, previously, to be

13    removed from this litigation and for reasons that are as

14    understandable.

15         They have recently received written I will call them

16    threats or notices that there are certain direct lenders that

17    intend to sue them for what they believe to be breaches of

18    their obligations as counsel.

19         Whether or not these threats have merit is really not for

20    me to decide.  But as a member of a law firm, I understand the

21    difficulties in trying to go forward with representation when

22    your clients are, indeed, threatening to sue you, so that is a

23    problematic issue that I will let the Jaworski attorneys

24    address.

25         In light of that, that situation, the receiver has

```
 1    undertaken contact with other firms of national repute and
 2    ability that would be able to take up the arms, so to speak.
 3         I did not want to present those as alternatives prior to
 4    the settlement --
 5              THE COURT:  Right.
 6              MR. COFFING:  -- because that was really not
 7    appropriate.  I'll --
 8              THE COURT:  But we can anticipate whether Jaworski or
 9    another firm of another 3- to $4,000,000 in completing through
10    trial at least if not probably short of appeal in concluding
11    the case.
12              MR. COFFING:  Well, regrettably, your Honor, I'd have
13    to say that the 3- to $4,000,000 would be low --
14              THE COURT:  All right.
15              MR. COFFING:  -- because the firms that we've
16    discussed that -- we have no ability to fund ongoing
17    litigation, and so we've been talking to firms on a contingency
18    basis.
19         And I would have to say that the numbers that would be
20    required on that end of the spectrum are quite high, and that
21    factors into the receiver's decision to put forward this
22    particular settlement option.
23         And if I could speak in those terms especially as it
24    relates to a recovery of a tort fund of $6,000,000, under prior
25    proposals that this Court rejected, that would have entailed a
```

1   recovery by a contingency firm of over $12,000,000, not

2   including the money that was spent or pledged win, lose, or

3   draw from that firm.

4        So we believe that the recovery from the tort-fund portion

5   of the settlement represents a substantial benefit to the

6   direct lenders as it is not only devoid of the guaranteed fees.

7        It is also devoid of the 50-percent recovery, and,

8   most importantly, it is collected, rather than chased at a

9   later date.

10            THE COURT:  And it does have the benefit of providing

11  a source for payment of the fees that have previously been

12  incurred by Cangelosi, the LLCs, and, of course, the current

13  efforts on behalf of the receiver.  That's the primary use of

14  the fund I'm assuming.

15            MR. COFFING:  Well, no, your Honor.  Actually, the --

16        (Colloquy not on the record.)

17            MR. COFFING:  The agreement states that the

18  $6,000,000 would not be disbursed for fees, but it would be

19  disbursed to the direct lenders --

20            THE COURT:  I see.

21            MR. COFFING:  -- on a formula to be derived by the

22  receiver, so we wanted to make sure that people understood that

23  that was to be distributed as to their funds subject to further

24  Court order, and we would obviously have the issue of other

25  funds, other of their fees, being paid --

```
 1                THE COURT:  Under the settlement --

 2                MR. COFFING:  -- at a later date.

 3                THE COURT:  -- how is class counsel to be

 4      compensated, then?

 5                MR. COFFING:  Well, the Court is already holding a

 6      one-percent withhold from the settlement of all the funds.  And

 7      if the class is certified, we would anticipate that that one

 8      percent is spread across all direct lenders, and it is the hope

 9      that that would be sufficient to compensate not only prior

10      counsel, but going forward.

11           (Colloquy not on the record.)

12                MR. COFFING:  That may not be depending on the

13      resolution of loans, and we may have to revisit that issue.

14                THE COURT:  Does the distribution call for a

15      distribution trustee?

16                MR. COFFING:  The receiver would be serving in that

17      responsibility --

18                THE COURT:  Uh-huh.

19                MR. COFFING:  -- your Honor.  Candidly, we have not

20      been able to work out all the details on loan-by-loan basis on

21      how the fees will be paid because it would largely be dictated

22      by whatever financing terms the receiver is able to come to to

23      provide the funds for the settlement.

24           We've worked closely with a couple of servicers, and we've

25      really narrowed it down to one that is confident that they
```

1    could provide those funds at a much lower interest rate that is

2    being --

3             THE COURT:  Uh-huh.

4             MR. COFFING:  -- objected to now at the 18-percent

5    rate.

6             THE COURT:  A very large number of the objections

7    expressed objection not only to the amount, but, also, to the

8    fact that it's currently payable, and that Compass receives

9    interest on that settlement amount.  That's, of course, what

10   obligates the trustee to find a financing source for that.

11       And how do you respond to those kinds of objections?  Why

12   should Compass receive interest on their fees or their accrued

13   interest?

14            MR. COFFING:  Well, I will let Compass address as to

15   why they believe they're entitled to interest on accrued fees.

16       As for the settlement proceeds, the interest is only

17   payable on those funds that are not able to be immediately

18   financed, so there is an 18-percent rate there.

19       But we're very optimistic that we would never incur that

20   18 percent because a subsequent servicer would be able to

21   provide the financing at a much lower rate, so that we would

22   not incur that 18-percent rate; however, there would be an

23   interest factor on there.

24            THE COURT:  So, in other words, if you don't have the

25   funds, you can finance through Compass, but you finance it at

1    an 18-percent rate.

2              MR. COFFING:  Correct, your Honor.  If --

3              THE COURT:  Uh-huh.

4              MR. COFFING:  To the extent we are unable to provide

5    all of the settlement funds, they would accrue at an 18-percent

6    rate.

7              THE COURT:  Uh-huh.  And is that anywhere near a

8    market rate?

9              MR. COFFING:  In a troubled portfolio as this, I

10   would say, no, it is not near the market rate, but I am told by

11   several sources in the business that it is not grossly out of

12   the range of a market rate.

13        We're looking at financing somewhere in the neighborhood

14   of a 30-day LIBOR plus six to eight points or six to nine

15   points depending on who ultimately provides the financing, and

16   so that is a much bigger number than it would have been just

17   two years ago.

18        So I will agree with the Court that 18-percent financing

19   on an unpaid balance is a handsome reward; however, we are very

20   optimistic that we would not incur --

21             THE COURT:  There's --

22             MR. COFFING:  -- a rate on --

23             THE COURT:  There's one other equitable factor that

24   concerns me, too, and that is they're entitled to those moneys

25   up-front even at -- some of it, of course, has already been

```
1    collected in settlement with borrowers.

2             MR. COFFING:  Correct.

3             THE COURT:  But some of it, maybe a substantial

4    part -- maybe you'll educate me on that -- has not been

5    collected.

6        So, in other words, they're entitled to immediate payment

7    under the settlement versus what they would be if it were

8    litigated.  They certainly would not be given the right to any

9    fees in advance of their actual payment by a borrower.

10            MR. COFFING:  You're correct, your Honor, but --

11            THE COURT:  Um-h'm.

12            MR. COFFING:  And I'll let Compass address their

13   position, but it is their position that they would be accruing

14   that interest rate, regardless.

15       So in that sense, I certainly understand why it is that

16   people believe that this is unfair, but, again, we're talking

17   in the context of a settlement.

18       This is the best that we could extract from Compass, and

19   that's why I characterize it it is the line in the sand that we

20   all know.

21       If we go forward and litigate, and the recovery on behalf

22   of the direct lenders is not superior to this, well, certainly,

23   there's going to be a great deal of regret.  You know, that is

24   their right as you have indicated.

25       And I do need to address the support for the settlement.
```

 1    You're correct, your Honor.  In the 300-plus written responses

 2    and the pleadings filed by various attorneys, I will agree with

 3    the Court that they represent an overwhelming rejection of the

 4    settlement terms.

 5        (Colloquy not on the record.)

 6            MR. COFFING:  However, privately, there are those who

 7    address support, and I'd like to read just one portion of a

 8    letter that I received.  It was addressed to me.

 9        "I'm not sure if I'm doing this private message correctly.

10    Hopefully, I am, and I'm sure I will hear a lot of flak from

11    the receiver Web site.  I'm reluctant to post this on the

12    Web site for fear of being yelled at by my fellow direct

13    lenders.

14        I am totally in favor of the mediated settlement.  This is

15    not a fight we can win.  Anyone who refuses to see that is

16    being foolish.

17        The desires of some of the direct lenders to fight until

18    my last dime is gone is not in the best of any direct lender.

19    I would rather keep what money I can, reinvest in something

20    legitimate, and move on with my life."

21        So, your Honor, what you've seen before you is

22    overwhelmingly negative, but you have not seen or heard from

23    everybody.  I cannot tell you that I have as well.

24        Our receiver Web site has roughly 1,000 registered members

25    who some of whom post actively, many of whom just read, but we

1    have over 2500 direct lenders who are largely unheard.

2         And they're unheard either because they're apathetic.

3    They don't have the access for some reason or that, arguably,

4    are in support of the settlement.

5         So I believe while they're unheard that interest needs to

6    be considered as well.  But from what you have in front of you,

7    we will agree that it is overwhelmingly negative.

8              THE COURT:  Um-h'm.

9              MR. COFFING:  But, again, it is the best settlement

10   that we can have.

11             THE COURT:  Now, there were some other objections,

12   too, the interest rate, the amount of the settlement --

13             MR. COFFING:  Correct.

14             THE COURT:  -- the broad brush.  That is allocating

15   across all notes.  I need you to respond to some of those

16   objections --

17             MR. COFFING:  Sure.

18             THE COURT:  -- too.

19             MR. COFFING:  The broad brush is inevitable at this

20   point in time because we have loans that have value, and we

21   have loans that do not have value.

22         And so in coming up with a single-dollar figure, the

23   allocation of the payment of that sum is going to vary across

24   the loans.

25         And as I said, it would be largely dictated by whatever

1    financing we're able to obtain as the financing would have in

2    the nature of a servicer advance a priority of payment, and any

3    prudent servicer would want to make sure that they have the

4    ability to collect at a minimum their advances.

5        So I acknowledge that the detail is not there for everyone

6    to look and say what does this mean to me.  But until we have

7    at least a tentative settlement, I cannot go to any financier,

8    make those arrangements, see how the allocation works, and then

9    convey it to the direct lenders, so that is an inherent

10   difficulty that we have.

11       We do have some definitive ideas on the distribution of

12   the tort fund.  We would wait until the loans are resolved and

13   calculate a loss based upon an original principal investment

14   across each loan and have that assigned pro rata based upon the

15   loss in each loan, and then those funds would be divvied up

16   again pro rata amongst original direct lenders --

17              THE COURT:  Now --

18              MR. COFFING:  -- in proportion to the --

19              THE COURT:  -- that's a very reasonable solution.

20   There may be other solutions.

21              MR. COFFING:  Sure.

22              THE COURT:  But that's not part of the settlement

23   that you noticed --

24              MR. COFFING:  That's correct.

25              THE COURT:  -- or the class or treatment of the

1    classes.

2              MR. COFFING:  That's correct, your Honor.

3              THE COURT:  Uh-huh.

4              MR. COFFING:  And, obviously, we have to get to the

5    point.  If just strictly the numbers are outside what the Court

6    believes are going to be reasonably within a judgment or a

7    range, then it made no sense, and, again, I would not have the

8    ability to make those calculations any further.

9         But I sense from what the Court is saying is it may not

10   matter, but these are obviously questions that would need to be

11   answered prior to a final fairness hearing.

12             THE COURT:  Now, also, the opt-out or lack of an

13   opt-out provision in this particular class I need you to

14   address briefly.

15        I understand the law presented to me.  You know, the

16   Ninth Circuit has approved a lack of opt-out in particular

17   kinds of class actions, those designated under the subclasses

18   in the statute, some sections of the statute, rather.

19        And that the issue here is amount versus declaratory

20   relief or equitable relief, and I need you to address briefly

21   that issue and argument.

22             MR. COFFING:  Well, I will leave my colleagues to

23   address the legalities of the opt-out issues, but I can tell

24   you how that came about.

25        It became very obvious when we were working with a class

1    structure that involved any type of payment on what we call the

2    termination and waterfall issues that there would be a

3    financial incentive for people to opt out of the payment of any

4    type of sum to Compass, and we believe that by providing a

5    mechanism to opt out it would effectively kill any possible

6    settlement.

7        So, again, this is a deal point and a deal breaker at the

8    insistence of Compass that we present this as a declaratory

9    relief on the waterfall and termination issues.  And in

10   exchange for the opt-out, we're able to extract the $6,000,000

11   on the tort-fund recovery.

12       So the idea if we presented this to the Court, and the

13   Court having, obviously, some --

14           THE COURT:  The class action by the way, too, and a

15   non-opt-out class action is the potential solution for the same

16   problem that Cangelosi faced.

17       That is how to assess a fair fee against all direct

18   lenders to the extent they want to participate any benefit from

19   litigation.

20           MR. COFFING:  That's correct, your Honor, but the

21   primary thing that I think I might want to get at is is if the

22   Court which ultimately has the authority to grant this motion

23   over objection, if the Court did so with the belief that the

24   settlement is in the range the Court has already at least not

25   ruled but intimated where the resolution of these matters would

1    come down, then the opt-out really becomes irrelevant because

2    it would effectively forestall a great deal of litigation

3    before the very body that is going to ultimately decide the

4    issue.

5         So in looking at the prior rulings of the Court -- or not

6    rulings -- the intimations of the Court, we felt that again it

7    is your mind.  If it's within that range, you would approve the

8    settlement.

9              THE COURT:  I --

10             MR. COFFING:  And that's --

11             THE COURT:  I really don't understand this last

12   argument.  The only intimation I gave you is I gave you

13   several-fold intimations, already, on the public record of the

14   Court's ruling on some of these issues.  Without being final

15   rulings, I told you --

16             MR. COFFING:  Sure.

17             THE COURT:  -- that I intended to defend and uphold

18   any right of Compass legitimately to servicing fees that they

19   had acquired.

20        On the other hand, I did not express any preference for a,

21   quote -- I don't know what waterfall means -- for a "waterfall

22   interpretation" --

23             MR. COFFING:  Sure.

24             THE COURT:  -- if that's what it means that they get

25   their fees first prior, for example, in a settlement for less

1    than 100 percent in contravention of principal due to direct

2    lenders or interest due to direct lenders.  I have never given

3    that intimation, and I don't think you've suggested that I

4    have, but --

5              MR. COFFING:  No, I have not, your Honor.

6              THE COURT:  But I guess the question I'm asking is

7    how does the 30 -- 30- or 35,000,000, how does that coincide

8    with the preliminary indications that the Court has given on

9    the rights of Compass to receive accrued unpaid fees on moneys

10   already collected consistent with the instruments and the

11   language of the servicing agreements and, yet, also consistent

12   with their obligation, their fiduciary obligations, to collect

13   either 100 percent of what's due everybody or, appropriately,

14   to stand as a fiduciary in making sure that the funds of the

15   beneficiaries of the trust if you will are met?

16             MR. COFFING:  Well, your Honor, I guess I would have

17   to state then you're right.  We're dealing with some

18   uncertainty.

19       Certainly, we've read all of your prior transcripts, and

20   you've used the concept of pari passu, and we even disagree as

21   to how that would be applied.

22       So in coming up with this number, we believe it represents

23   a substantial discount, some 40 percent, to what the general

24   consensus of what pari passu would imply.

25             THE COURT:  I'm a little bit queasy about the

1    analysis underlying that representation.  For example, if

2    you're just saying that's 40 percent, and that's a substantial

3    discount from every dollar of fees and/or servicing fees and/or

4    default interest that they've claimed, I don't follow it, and I

5    don't get it.

6             MR. COFFING:  Well --

7             THE COURT:  If what you're saying on the other hand

8    is we've reviewed note by note these notes are worthless, so

9    we're not taking into consideration their claim for servicing

10   fees or default interest on these particular notes, on these

11   notes their claim is much less valuable because it's obvious

12   that the property is substantially less than 100 percent of

13   what's due everyone, on these loans their claim is very

14   valuable because either it's being paid in full or it's very

15   clear that the payment to include their fees would be enough to

16   pay 100 percent of principal or at least 100 percent of

17   everything that the direct lenders have demanded, so that's the

18   kind of analysis that I would expect to support this 40-percent

19   figure, rather than just simply a ballpark large discount.

20        (Colloquy not on the record.)

21             MR. COFFING:  Well, your Honor, that analysis on a

22   loan-by-loan basis I'll represent was not done in the four days

23   between the appointment and the mediation.

24        Ultimately, I can say that it is -- as in any settlement

25   regardless of how we got there, it is the number that they

```
 1    would take, and it is the number that we brought.

 2         And so, certainly, what you're suggesting now is an

 3    analysis that needs to be undertaken in going forward in any

 4    proposed class action.

 5         And we will certainly undertake that analysis, but I

 6    cannot tell you that that was done as part of this mediation

 7    settlement.

 8              THE COURT:  Okay.  Thank you.

 9              MR. COFFING:  But I would leave to Compass to explain

10    at least their position on why it is that they believe it's

11    appropriate other than the fact that, you know, it got us to

12    where we are --

13              THE COURT:  Okay.

14              MR. COFFING:  -- in that sense.

15              THE COURT:  Please.

16              MR. COFFING:  Thank you.

17              THE COURT:  I'll call on them next, and then we'll

18    hear objections or comments, please.

19         (Colloquy not on the record.)

20              MR. MOORE:  Your Honor, I would be pleased to speak

21    next.  I don't know if Mr. Mainland's --

22              MR. MAINLAND:  (Indiscernible).

23              MR. MOORE:  Okay.  Your Honor, Robert Moore of

24    Milbank, Tweed on behalf of Compass.

25              THE COURT:  Um-h'm.
```

1          MR. MOORE:  And with your indulgence, I'd like to

2     make a relatively-thorough presentation because we have a

3     number of people in the courtroom, and I want them to be clear

4     and understand what our position is and why our position is

5     what it is.

6          I'm not going to go over the matters addressed by

7     Mr. Coffing, although I will try to answer the questions that

8     your Honor posed to Mr. Coffing that he redirected to Compass.

9          What I'd like to start with, an analysis of what really

10    has been settled because I think there's been a gross

11    misrepresentation of what has been settled.

12         There are approximately $15,000,000 in advances, servicer

13    advances.  The vast bulk of those have to do with fees incurred

14    by various local counsel across the country that have been

15    pursuing the interests of the direct lenders in bankruptcy

16    cases, in state law foreclosure actions --

17              THE COURT:  These are not --

18              MR. MOORE:  -- in litigations --

19              THE COURT:  -- any fees in fighting with the direct

20    lenders.  These are strictly limited --

21              MR. MOORE:  That is --

22              THE COURT:  -- to fees to collect the notes.

23              MR. MOORE:  That is absolutely correct.  Well,

24    your Honor, we heard very clearly your admonition on that

25    point at one --

```
 1              THE COURT:  Keep them separate.

 2              MR. MOORE:  -- of the prior hearings.  They are

 3    absolutely kept separate.

 4         And then I also want to point out that pursuant to our

 5    agreement in the settlement and your Honor's insistence we had

 6    already I think included it, but these are all subject to audit

 7    by the receiver.  Okay?

 8              THE COURT:  And is that 15,000,000 included in the

 9    overall figure?

10              MR. MOORE:  That would be.  When people refer to this

11    as a $60,000,000 number, that's included, but I want to make it

12    clear some portion of that remains unpaid accounts payable or

13    work in process.

14         Some represent payments that have been made, but this is

15    not profit in any sense or recovery in any sense to Compass.

16    This is the payment that any servicer would have to third-party

17    vendors --

18              THE COURT:  And how is that --

19              MR. MOORE:  -- to support it.

20              THE COURT:  -- 15,000,000 in advances and fees to

21    collect payments to an underlying first trust-deed holder,

22    et cetera?  How is that 15,000,000 recovered by Compass in this

23    settlement?

24              MR. MOORE:  All right.  And let me add the second

25    piece because that's recovered as part of this initial
```

```
 1    refinancing.  It is the only piece of it that is guaranteed.
 2         In other words, the servicing-fee component and the
 3    advance component has to be refinanced on day one when we go
 4    effective as a condition that Compass has placed in the
 5    agreement.  If it is not the agreement, it isn't effective --
 6              THE COURT:  So the agreement --
 7              MR. MOORE:  -- and doesn't go forward.
 8              THE COURT:  -- provides for that paid immediately --
 9              MR. MOORE:  Yes.
10              THE COURT:  -- upon --
11              MR. MOORE:  But the other piece of it --
12              THE COURT:  -- the effective date.
13              MR. MOORE:  -- the 28.5 net recovery on the
14    disputed-fee piece, it is not a condition that that be paid on
15    day one.
16         I think Mr. Coffing expressed the receiver's desire to
17    refinance that on more favorable terms and dispose of it, in
18    part, because of the economics, but, also, in part, because a
19    new servicer coming in at that point has defined rights going
20    forward and has resolved the economic issues that were disposed
21    of under the settlement agreement.
22         But let me turn to the servicing-fee piece because I think
23    there has been some misunderstanding in various pleadings and
24    letters and other papers that have been filed with the court as
25    to that issue.
```

1          And I would like to start by saying, your Honor, we have

2    been before this Court now for close to a year.  And in the

3    first and second days of October of 2007, we addressed the

4    preliminary-injunction issues.  That was actually a continued

5    hearing, and we had previously done so before Judge Riegle.

6          And in that process, it became very clear to us what the

7    expectations of this Court were as to how Compass would

8    function with respect to its fiduciary duties and the fact that

9    it did own a piece of recoveries from borrowers, but it also

10   had fiduciary duties to the lenders.

11         And it was very clear that we were to follow the path of

12   proposing settlements and restructurings and workouts and sales

13   along a path that would look to the direct lenders for consent,

14   and that we required unanimous consent to do that, but that we

15   had to separate the issue of Compass' disputed fees.

16         So since that time a year ago, Compass has proceeded down

17   the path where to the extent there is a recovery, and there is

18   not unanimous consent to Compass being paid disputed fees.

19         And, your Honor, from the very earliest point in time, we

20   had offered a pari passu distribution, but it was never subject

21   to a 100-percent consent.

22         So those fees which Compass believes its entitled to were

23   impounded subject to an interest-bearing account.  All other

24   fees, all other recoveries, would be distributed to direct

25   lenders.

1        Now, of late, there have been very few consummated

2    settlements because we basically are having trouble getting

3    consents to do just about anything.

4        But I just wanted to make it clear that Compass has taken

5    very seriously every comment the Court has made in the various

6    hearings we have had and has tried under the advice of its

7    counsel to comply strictly with the admonitions of the Court.

8        The second thing I wanted to point out is that from the

9    very earliest point in time the servicing fees were never

10   really at issue in the litigation or in our negotiations.

11       In fact, from the earliest point in time with

12   Ms. Cangelosi, there was always a statement made that the

13   servicing fees are not at issue.  You're entitled to your

14   servicing fees.  What we're here to negotiate is the

15   disputed-fee issues.

16       There also were the tort claims which are separate damage

17   claims, but the contractual servicing claims were not at issue,

18   and I --

19            THE COURT:  You're talking about one or two or

20   three percent.

21            MR. MOORE:  The average of 1.7 percent, and it

22   varied, but the --

23            THE COURT:  Um-h'm.

24            MR. MOORE:  The important thing that's never actually

25   been put on the record in this court that I want to do today

1    just so, again, all of the direct lenders will understand what

2    our position is, Section Roman Numeral IV-F of the plan which

3    is titled loan distribution and loan-servicing agreements

4    states clearly that, "After the effective date of the plan, the

5    direct lenders are obligated to comply with the terms of the

6    loan-servicing agreements, including payment of fees which are

7    set forth in the loan-servicing fee schedule included in the

8    direct-lender supplement."

9        Now, the loan-servicing agreements were defined in the

10   plan as being agreements whether oral or written under which

11   USA Commercial Mortgage had been servicing the loans.

12       We have attached as Exhibit K to the declaration of

13   Mr. Weaver, an attorney in our office, the loan-servicing fee

14   schedule.  That has been filed under seal with this court.

15       It similarly had been filed under seal with the bankruptcy

16   court because there never has been exposition to all

17   3,000 lenders of what everyone else's contract terms were.

18   Each individual was informed, but that's why it has been filed

19   under seal.

20           THE COURT:  Now, those agreements, they aren't per

21   note.  Basically, they're a general agreement with a particular

22   lender.  Here's a servicing fee for any loans --

23           MR. MOORE:  Yes.

24           THE COURT:  -- that you invest in.

25           MR. MOORE:  Yes.  And what that is defined as is it's

1    the schedule setting forth the amount of the servicing fees

2    payable under each of the loan-servicing agreements which will

3    be transferred to the asset purchaser at closing as part of the

4    asset-sale transaction.

5        Now, each lender as part of the direct-lender supplement

6    which was distributed at the time of the plan confirmation and

7    in the context of the objection period before the plan was

8    confirmed reads as follows.  This is very important.

9        It's attached as Exhibit C to Exhibit L to Mr. Weaver's

10   declaration.  It's addressed to each vesting name and its

11   address and reads as follows:

12       "The records of USACM show the following loan-servicing

13   agreements for you and the corresponding service-fee

14   percentages and monthly-servicing fees on such loans.

15       Pursuant to the terms of the plan of reorganization, this

16   is the amount of the monthly-service fees to be charged against

17   your account from April 2006 forward.

18       To the extent you disagree with the service-fee

19   percentages and/or monthly-servicing fees set forth below or to

20   the extent you believe they are inconsistent with your

21   loan-servicing agreement, you must object pursuant to the terms

22   of the plan and the alternative dispute-resolution agreement."

23           THE COURT:  Now, that's fine, and I hear what you're

24   saying, but that doesn't give you -- for example, on a

25   nonpaying note, you're not entitled to a servicing fee, right?

```
  1              MR. MOORE:  Well, we would be entitled to it.  The
  2       issue is could you collect it.  It simply would be --
  3              THE COURT:  But you can't collect it nor are you
  4       entitled to it on a per-month basis if there is no payment.
  5              MR. MOORE:  Your --
  6              THE COURT:  You are certainly --
  7              MR. MOORE:  Your Honor --
  8              THE COURT:  -- entitled to it --
  9              MR. MOORE:  -- we --
 10              THE COURT:  -- out of a payment in full or a catchup
 11       payment.
 12              MR. MOORE:  We understand that, your Honor.
 13              THE COURT:  But you're not entitled to a
 14       month-after-month accrual where there is no payment.
 15              MR. MOORE:  We --
 16              THE COURT:  You're saying you're entitled to the fee
 17       upon payments actually made.
 18              MR. MOORE:  Your Honor, and I believe that's part of
 19       what will be the auditing function of the receiver in this
 20       process, but I --
 21              THE COURT:  And you're just saying there were no
 22       objections to that notice that went out --
 23              MR. MOORE:  There --
 24              THE COURT:  -- to each lender.
 25              MR. MOORE:  There were a few, and they were resolved
```

1    and finalized by Judge Riegle, but all 3,000 direct lenders

2    were given this notice, the stated percentage, told this is

3    what your LSA contract fee is.

4         If you have a problem, come to court now, go through

5    the alternative dispute-resolution mechanism, and we'll decide

6    it.

7         Here we are two years later, and I see in a number of

8    these letters, you know, I don't have an LSA.  I don't have a

9    servicing fee or I disagree with what you say my servicing fee

10   is or why should we pay any servicing fee.

11        And I think that there's an issue of res judicata here

12   as a legal matter, but there's also just an issue of

13   fairness.

14        This was all set up, so that it was very clear that

15   Compass knew what it was purchasing when it paid its

16   $50,000,000, and that was a system --

17             THE COURT:  Now --

18             MR. MOORE:  -- that Judge Riegle --

19             THE COURT:  -- that raises --

20             MR. MOORE:  -- put in place.

21             THE COURT:  -- an obvious question on fairness of the

22   settlement.  Should I not have at least a settlement supported

23   by an analysis based upon that supplement?

24        Here is the total fees that they're entitled to under that

25   supplement on moneys collected so far, and that is an

```
1    X-dollar figure or it's an X-dollar figure per note, and that

2    supports the ultimate settlement because the settlement is a

3    discount from that figure --

4              MR. MOORE:  Well --

5              THE COURT:  -- or it's that figure --

6              MR. MOORE:  Well, your Honor, let me --

7              THE COURT:  -- plus a discount of the default --

8              MR. MOORE:  Yeah.  Let me --

9              THE COURT:  -- fee.

10             MR. MOORE:  Let me make it clear.  We could have

11   simply crafted the settlement agreement with language that

12   spelled out what the rights of Compass were.

13        Instead, in addition to doing that, we wanted for

14   disclosure purposes to put out an approximate number.  It is

15   merely an approximation.

16        It's subject to audit, and that's exactly what the

17   receiver is going to do.  We provided the receiver with the

18   Exhibit K.

19             THE COURT:  But the audit is just a basis for the

20   subsequent allocation.  It doesn't vary the settlement amount,

21   does it?

22             MR. MOORE:  No.  But it will determine whether our

23   calculation of servicing fees is compliant with the

24   determination of what those fees were --

25             THE COURT:  Well --
```

44

```
1              MR. MOORE:  -- in the bankruptcy process.
2              THE COURT:  -- then don't I need an analysis if not
3      an audit -- hopefully, not an audit -- but at least an analysis
4      of what that figure is per note, so that I can see whether the
5      ultimate settlement amount is a discount, in fact, or really
6      just --
7              MR. MOORE:  Oh, well --
8              THE COURT:  -- an agreement to pay in full --
9              MR. MOORE:  Well --
10             THE COURT:  -- to --
11             MR. MOORE:  Well, let me --
12             THE COURT:  -- Compass?
13             MR. MOORE:  Let me address that because, again, I
14     want to separate the disputed-fee issue from the servicing fee.
15     As I mentioned, that was never at issue.  Let me do --
16             THE COURT:  Okay.
17             MR. MOORE:  -- an --
18             THE COURT:  I understand what you're saying, but
19     is this --
20             MR. MOORE:  Yeah.  Your --
21             THE COURT:  Do you have an amount for --
22             MR. MOORE:  Your Honor --
23             THE COURT:  -- an agreed servicing fee?
24             MR. MOORE:  -- we have estimated that at $15,000,000
25     for the life of Compass' participation.
```

```
1              THE COURT:  So, in other words, the 15,000,000
2   includes a servicing fee that you believe has been agreed to in
3   percentage amount --
4              MR. MOORE:  Yes, your Honor.
5              THE COURT:  -- by each direct lender or at least not
6   objected to, and the 15,000,000 does not break out a servicing
7   fee, however, on already collected versus future collections --
8              MR. MOORE:  If --
9              THE COURT:  -- including a final payoff.
10             MR. MOORE:  If there was a collection or a
11  resolution, servicing fees stop, so this only --
12             THE COURT:  For sure.
13             MR. MOORE:  And when --
14             THE COURT:  But there --
15             MR. MOORE:  -- under this --
16             THE COURT:  -- are still future amounts --
17             MR. MOORE:  Yeah.
18             THE COURT:  -- to be collected.
19             MR. MOORE:  When under this settlement --
20             THE COURT:  The 15,000,000 includes both collected
21  and future to be collected.
22             MR. MOORE:  It doesn't include collected.  If it's
23  collected, it's not included in that number.  This only is
24  unpaid accrued servicing fees.  And the sooner that under this
25  settlement agreement Compass can be replaced by a new
```

```
1    servicer --
2               THE COURT:  Okay.
3               MR. MOORE:  -- of the receiver's choice --
4               THE COURT:  So it is totally future.
5               MR. MOORE:  -- it will stop.
6               THE COURT:  It's the percentage.  It's 15,000,000 is
7    your estimate per direct-lenders' agreement --
8               MR. MOORE:  Right.
9               THE COURT:  -- on future moneys to be collected --
10              MR. MOORE:  Yes.  Your Honor, and I'm going to get to
11   a moment in your --
12              THE COURT:  -- if assuming each note is paid in full.
13              MR. MOORE:  Right.  And I'll get to in a moment the
14   timing issue which you asked --
15              THE COURT:  Uh-huh.
16              MR. MOORE:  -- Mr. Coffing about, but I also want to
17   put on the record because I think this is important I read the
18   hundreds of letters.
19        And the bulk of them simply said Compass has done nothing.
20   It's not entitled to anything.  It was a blanket statement, and
21   I wanted to put this on the record.
22        Compass in the period in which it's been a servicer has
23   resolved ten loans, one of those pursuant to a mediation before
24   Judge Russell, the BAR-USA loan, but, also, the San Fernando,
25   Bay Pompano, Clear Creek, La Hacienda, Shamrock,
```

1    Fiesta Stoneridge, SVRB 2.3 million, and SVRB 4.5 million, and

2    Standard Property loans.  Those are resolved through a total

3    consent of the parties involved.

4         There also has been a resolution pending direct-lender

5    approval of two additional mediated matters, the Binford loan

6    mediated by Judge Nakagawa to agreement and put on the record

7    not yet approved by lenders and The Gardens 2.425 million and

8    The Gardens Timeshare loans again mediated before

9    Judge Nakagawa, Harbor Georgetown, Mountain House, Gess, and

10   Palm Harbor.  Those are all pending direct-lender approval, so

11   that's seven loans.

12        Nine of the loans are already now in owned, real-estate

13   owned, postforeclosure exercise of remedies and are now owned

14   on behalf of the direct lenders, and Compass is in the process

15   of marketing and selling those.

16        Those include Anchor B, Bundy Canyon 2.5 million,

17   Bundy Canyon 5 million, the Cornman Toltec, Foxhills, Gramercy,

18   Lake Helen, Ten-Ninety, and Huntsville.

19        There are an additional eight loans which are in

20   foreclosure.  Foreclosure is in progress on the

21   Bundy 5.7 million, Bundy 7.5 million, Con Vest, Eagle Meadows,

22   Fiesta Murietta, Clearlake, Marlton Square, and Ocean Atlantic.

23        And then, additionally, there are 12 loans in the midst of

24   negotiation, including three, Castaic II, Castaic III, and

25   Tapia Ranch, that were all subject to the Judge Russell

1    mediation, and I won't read the other ones, but there are a
2    number of those there.
3         So what I want the Court to understand and, frankly, the
4    direct lenders that may not be informed, Compass as servicer
5    has been working very hard to resolve loans, has resolved a
6    number of them, and put a number of them in a position if a new
7    servicer comes in to simply foreclose, to go forward with the
8    sale of the collateral, or whatever other remedies they're
9    going to pursue.
10        And this is, in part, what the servicer advances were
11   incurred for.  There have been counsel that have been pursuing
12   these remedies.
13        THE COURT:  One of the ultimate questions -- and I
14   appreciate your presentation, and I certainly accept it in
15   general terms.
16        But one of the ultimate questions I'll have is what final
17   figure do we have, and how does it fold in the 15,000,000
18   advances and the 15,000,000 you have estimated for future
19   servicing fees because the receiver has told me, of course,
20   that in their analysis of the settlement and in substituting a
21   new servicer the place they look for payment of a future
22   servicer let alone Jaworski and the attorneys fees already
23   accrued would be the servicing-fee portion that's assessable
24   against each direct lender.
25        MR. MOORE:  Well, I think what they are talking about

```
 1    doing is assessing the one percent that is the direct-lender
 2    portion of a recovery on a loan.
 3         And, incidentally, I've got some figures on that that
 4    aren't final, but I thought that might be something the Court
 5    or the parties might be interested in.
 6         We are presently holding -- if I can find my notes here --
 7    here it is.  Your Honor, we are holding -- and I'm going to use
 8    rough numbers here -- $163,000 from the one-percent holdback on
 9    San Fernando, BAR-USA, and Shamrock.
10         We have already paid the LLCs $51,000 on La Hacienda.
11    That's a total of $214,000.  Bay Pompano will pay off at the
12    end of this month of August.  That's another $60,000, so the
13    total will be about $274,000, and then there is the additional
14    one percent from all the remaining portion of the portfolio.
15         And, your Honor, I believe that it's implicit in the
16    filing we made, but I think Compass' view of the aggregate
17    value of that portfolio is in the vicinity of $300,000,000
18    plus.
19         So the fact of the matter is we think that there is ample
20    availability there to address the needs of the receiver and his
21    counsel.
22         But, more importantly, I want to go to the issue of
23    allocation, and this kind of segues --
24              THE COURT:  In --
25              MR. MOORE:  -- into --
```

1          THE COURT:  In that connection since you're

2    transitioning to allocation, am I required under this

3    settlement to assess direct lenders that weren't part of LLCs

4    who have already been paid out of notes that you have suggested

5    have already been settled and paid?  Am I required to assess

6    them --

7          MR. MOORE:  Well, your Honor, I --

8          THE COURT:  -- for any allocable share of this

9    settlement?

10          MR. MOORE:  I'd have to really defer to the receiver

11    on that, but the order that your Honor has made is that the one

12    percent that's assessable against the direct lenders who were

13    members of LLCs and agreed to that assessment in joining the

14    LLCs in the future would be directed to the receiver to be held

15    in an account subject to a ruling of the Court.

16        I think the equitable result if you have a single class

17    consisting of all direct lenders in a settlement that benefits

18    all direct lenders would be to make that assessment, but that's

19    not for Compass to even have a view on.

20        We believe that the receiver has performed a very valuable

21    service, and we have, obviously, no position, but we'd fully

22    support if we had a position the receiver being compensated.

23        I mean, the receiver stepped into a very ugly situation

24    that was to say the least dysfunctional.  There were some

25    200,000 pages of documents that we had already produced to

51

1    Fulbright & Jaworski, and those had been produced literally at

2    the end of 2007 in our litigation.

3        We had only received about 6,000 pages from the LLCs,

4    but we had produced everything that we believed had been

5    requested.

6        (Colloquy not on the record.)

7            MR. MOORE:  The receiver I know flew down to Dallas,

8    met with the Fulbright litigators, and did his due diligence.

9    We sat down with the receiver and his counsel and also with the

10   Fulbright firm and went through a detailed analysis of what we

11   believed our counterclaims were, what we believed our defenses

12   were to the affirmative claims citing to specific documents,

13   and, basically, laying out our case.

14       The receiver didn't lay out his case.  The LLCs didn't lay

15   out their case for us, but we wanted the receiver to be fully

16   informed of the case we would be putting before your Honor.

17       And, your Honor, we haven't put any of our evidence in

18   place, yet, as to termination issues, as to the disputed-fee

19   issues, but we wanted the receiver to understand our case.

20       And I am assuming the receiver -- and I know for a fact

21   the receiver did his diligence on the other side of that

22   equation in coming into the mediation and having an

23   understanding of where he thought an appropriate settlement

24   number would be, so, you know, I just want to put that in the

25   background.

1        I'm not going to go through a detailed list of all the

2    factors of what approval at this stage or, frankly, even at a

3    final stage of a class settlement would entail.

4        But when you tick down the list, it's very similar, and

5    your Honor was, you know, a very highly-esteemed bankruptcy

6    judge at a past point in your service on the bench, and so

7    you're familiar with the Bankruptcy Rule 9019 settlement

8    standards.  It's somewhat similar, but even more expansive.

9        The receiver had to look at the issue of the strengths of

10   his case, the strengths of Compass' claims back and defenses,

11   the cost of moving forward, the risk of moving forward, the

12   complexity of the matter, the duration and delay entailed in

13   litigating it, the amount of the settlement -- and I want to

14   get to that now because I'm now talking about the settlement of

15   the disputed fees which was really the issue in the

16   litigation -- the stage of the proceeding and extent of

17   discovery completed which I have already commented on, the

18   experience and views of counsel.

19       And as the Court has already noted, the Fulbright firm is

20   a highly-regarded national firm, and it brought in through

21   Mr. Mainland, a very senior and highly-regarded lawyer in the

22   Los Angeles office, and class-action partners familiar with

23   class actions who handle class actions regularly in their

24   office into the dialogue with Compass' counsel and the receiver

25   to establish that this was an appropriate vehicle and fine-tune

1    it to fit within the parameters of class-action settlements and

2    the Ninth Circuit law and the ability to maintain a class

3    action which really relates to whether or not 23(b)(2) and the

4    Ninth Circuit Linney case support a none-opt-out class action

5    such as this, but the last factor is the one your Honor pointed

6    to, the reaction of class members.

7        Now, I think it's pointed out that some 300 or so letters

8    have been received by the Court.  The actual detailed and more

9    substantive pleadings filed were all filed by the claims

10   traders who have I think a very different perspective on the

11   settlement and come to it from a different point of view.

12       And I think the receiver may have different points of view

13   in terms of how they should be treated, but let me focus on the

14   direct lenders themselves.

15       This was a hearing for a preliminary approval.  There was

16   a mass call on the receiver's Web site to file objections, send

17   letters to the court, and that happened, but it happened by

18   some 300 out of some 3,000 direct lenders, some ten percent of

19   the body.

20       If you support this settlement aside from the pressures

21   that I think Mr. Coffing alluded to in publicly doing that

22   given the vitriol that exists, frankly, in the community, you

23   wouldn't necessarily be filing anything here.  Why would you

24   file that?  You would file it to say I oppose, and that's

25   what's happened.

1          But that does not mean that if all of those lenders were

2     apprised of how the receiver arrived at this result as a fair

3     and equitable settlement, how he evaluated the prospects of

4     proceeding down a litigation path, and, importantly, the risks

5     of the settlement in this context and in this structure not

6     going forward I believe there will be substantial support.

7          That is for the final hearing.  That is subject to the

8     receiver doing the kind of diligence your Honor is talking

9     about, sending out the kind of disclosure and analysis that I

10    think would set forth why this is viewed by the receiver as a

11    good and fair settlement.

12         I do think it's important -- and this is the last major

13    point I want to make -- to look at the issue of why the

14    none-opt-out class structure was selected and what happens if

15    this settlement which from Compass' view is the final and best

16    settlement that could be generated after literally now almost

17    six months of mediation, intensive negotiation, and, quite

18    frankly, a result that puts them in a position where they are

19    going to lose money after investing, basically, in two years of

20    an investment in these servicing rights in an attempt to

21    implement its business plan to acquire these and service these

22    loans.  It is basically walking away empty-handed.

23         If a new servicer is -- if this agreement isn't approved,

24    let's see where we are, and I'm going to speak in sort of more

25    of a hypothetical sense here.

1          Compass is what's called a single-purpose entity.  It is a

2    vehicle common in creating any kind of an acquisition in which

3    a limited-liability company is established for the purpose of

4    acquiring an asset and then performing the business operations

5    that that asset entails, and that's what happened here.

6          So the sole assets of the Compass entities we're talking

7    about, all of the Compass entities, are the rights that it

8    purchased out of the bankruptcy case.

9          So to the extent that direct lenders believe there are

10   claims against Compass, they need to understand that those

11   claims have no value beyond the mere value of the assets that

12   we're talking about.

13         There is no deep pocket which I believe the direct lenders

14   have been led to believe exists out there to recover hundreds

15   of millions of dollars.

16         What happened here is you had a fraud perpetrated by

17   USA Commercial Mortgage.  Frankly, it was a Ponzi scheme.  You

18   have loans that were made on very weak collateral, in many

19   cases, raw land, the idea being to flip that quickly and make a

20   profit from it.

21         There are a number of apartment complexes that are in

22   extremely-undesirable parts of urban areas with high-crime

23   rates and problems in terms of their maintenance, et cetera.

24   These are not prime properties, and that's what hard-money

25   lending is.

1        It's where you can't get a bank or an institutional lender

2    to finance your acquisition.  You have to go out at these

3    superhigh rates of return, the 12 to 14 percent that USA

4    promised to the investors who invested here, in these risky

5    investments.

6        And what happened after being, in essence, defrauded into

7    these investments is we've had a massive collapse in the

8    real estate market, and we've had a massive collapse of the

9    credit markets.

10        So not only have property values plummeted, but the

11    ability of borrowers to finance their way out of these

12    properties and settle it, the ability to sell to a new buyer

13    who has to obtain financing to purchase is not there.

14        We happen to be in a historically-depressed situation for

15    collateral such as this.  Those are not circumstances that

16    Compass is responsible for.  Those are the results of the

17    external market and USACM, the originator.

18        And, therefore, when you look at this single-purpose

19    vehicle in this scenario, if the settlement agreement isn't

20    approved, I don't know what happens to Compass.

21        I don't know whether it just throws up its hands, walks

22    away, files a bankruptcy case.  I don't know whether Silar

23    forecloses.  I don't know whether these direct lenders in their

24    litigation are now dealing with Compass.  They're dealing with

25    Silar.

1          Whether it's Compass or Silar, Silar's security for the

2    financing of this acquisition are the very same assets that

3    Compass has, so it doesn't matter whether you're looking at

4    Compass or Silar.

5          There will be continued litigation over the underlying

6    issues whether it's termination, whether it's the entitlement

7    to the default interest and the priority under different note

8    structures, whether it's the recovery of the servicing fees and

9    advances.  All of that will be at issue, so you've got that as

10   a backdrop.

11         And then you're going out to a servicer, a new servicer,

12   and you go to that new servicer and say, hey, come in and help

13   me out here.

14         Well, we know that what Compass -- excuse me -- what the

15   receiver presently has found is a servicer that has quoted --

16   only one's given a written proposal, apparently -- but between

17   55 basis points which means .55 percent, half of one percent,

18   and two percent, the other major alternative, as a servicing

19   fee -- Compass has averaged 1.7 -- and 3 percent as an exit

20   fee.  Okay.

21         So any servicer with a completely-settled matter, with

22   this thing put to bed, release his exchange, the litigation

23   gone, the rights of Compass absolutely defined is willing to

24   come in only on that basis, imagine what happens if this now

25   deteriorates into a total litigation nightmare with no

1    perceived end, continued accrued expenses on both sides, but

2    the direct lenders, presumably, at that point are going to have

3    to finance that litigation.  It's a nightmare.

4        And, quite frankly, I think that's what in some measure

5    led the receiver to conclude that creating peace in the valley

6    a new servicer which has been huge issue for direct lenders

7    with whom they have confidence a structure that everybody can

8    agree to, Compass' issues resolved and out of the way, Compass

9    out of the picture, that was a way to go forward and maximize

10   the recoveries.

11       Without that, I fear, your Honor, that this is simply

12   years of litigation, and the end is going to be Compass has no

13   value, Silar has no value, the receiver has no value, the

14   direct lenders have no value.

15       And would the lawyers have gotten rich?  Unlikely, because

16   there's probably nothing to pay any of them.  It truly is a

17   nightmare scenario, so I'm painting this hypothetically, but I

18   think it's the reality of where we are in this process.

19       Now, the last piece, you've got to understand when a new

20   servicer comes in he's looking at a situation in which it is

21   required unanimous consent to do deals.

22       The Gess property out there is a situation in which

23   Compass elicited, negotiated, and obtained a settlement

24   proposal that wouldn't pay lenders in full that it proposed.

25   And, of course, the disputed-fee portion for Compass goes into

1    a separate account.

2        It's simply saying this is the best we think exists in the

3    marketplace.  We recommend you take this deal.  And, oh, by the

4    way, the balconies are deteriorated, and the City of Houston is

5    in there telling us we have to repair those.  Oh, by the way,

6    the apartment next-door, the balcony collapsed, and two people

7    died.

8        Oh, by the way, the property manager on Gess has now

9    threatened to resign because he knows the City will ultimately

10   hold him responsible if there is that kind of injury on the

11   property on his watch.

12       And so we have gone back to the direct lenders and said

13   it's going to cost somewhere between 2- and $4,000,000 to

14   refurbish the property, meet the standards of the City, hold

15   this property for two years and operate it, remarket and sell

16   it.

17       And based on the appraisals we obtained from several

18   sources, the expert opinion we've obtained which was all

19   delivered to the direct lenders in conference calls that they

20   were invited to participate in, they have said that is a risky

21   proposition.

22       Do you want to fund 2- to $4,000,000 on a $50,000

23   investment in Gess, for example?  That would mean you would

24   have to fund 10,000 more dollars.

25       Well, in that situation led by a claims trader, that

1    proposal was defeated.  We couldn't obtain 51-percent approval,

2    and that wasn't 100 percent because it was a sale.  And under

3    the LSAs, that only requires 51 percent.

4        We turned all of this information over to the receiver.

5    The receiver conducted his own due diligence, sent somebody in

6    person to this property, said it is in a rundown part of town,

7    crime-ridden part of town.

8        It is a terrible piece of property.  The receiver

9    supported and recommended acceptance of this.  The direct

10   lenders still turned it down.

11       So what I'm saying to you is a new servicer is going to

12   come in and see a situation in which these direct lenders did

13   not accept what Judge Riegle determined to be the appropriate

14   sale in the bankruptcy court and turned around and immediately

15   constructed a path to litigate and attempt to deny Compass any

16   recovery.

17       And now we see letters that say, basically, I don't think

18   any servicer is entitled to anything.  I'm not going to pay the

19   advances.  I'm not going to protect my property.

20       Basically, I have lost my investment, and many of these

21   people invested their life savings and were relying on this for

22   retirement.

23       But they haven't faced the facts that the best approach

24   now is to find the best recovery that is available and move on.

25   That's a hard thing to do.  It's now a hard thing to do for

1    Compass.  Compass is going to walk away from any recovery in

2    this matter.

3         (Colloquy not on the record.)

4              MR. MOORE:  And I hear some hisses in the crowd, and,

5    your Honor, I have got to reiterate Compass paid $50,000,000 to

6    purchase these assets.

7         They've funded $15,000,000 of advances.  So if you

8    just look at money out of pocket, that's $65,000,000 right

9    there.

10        That doesn't deal with their operating expenses, the

11   interest costs they've had to pay for their financing.  It

12   doesn't deal with the fact that they haven't been paid

13   $15,000,000 of servicing fees.  How do they support their

14   overhead?  You know, this is a business operation.

15        This is not a situation in which Compass is walking away

16   with a profit, and I think that a real dose of the reality as

17   to where we are is in order, and I've tried to lay that out

18   here before your Honor.

19        I don't think that the issue of what I'll call the

20   doomsday scenario if everything were to blow up is something

21   that the Court would look to necessarily in preliminarily

22   approving this settlement, but I think it's a reality in this

23   case.

24        And I think it's something that when direct lenders are

25   fully educated as to the real situation here that there isn't a

1    quick out, there isn't a new servicer willing to come in at

2    cheap servicing rates and walk into the nightmare of no

3    releases and continued litigation that they will understand at

4    some point you've got to cut your losses, and you've got to

5    accept a fair and reasonable settlement.

6         The receiver believes this is fair and reasonable.

7    Compass believes this is fair and reasonable.

8              THE COURT:  Thank you very much.

9              MR. MOORE:  Thank you.

10             THE COURT:  You're for Silar?

11             MR. FORSTOT:  Yes, your Honor.

12             THE COURT:  Uh-huh.

13             MR. FORSTOT:  May I be heard briefly?

14             THE COURT:  Uh-huh.

15             MR. FORSTOT:  Thank you.

16        (Colloquy not on the record.)

17             THE COURT RECORDER:  Can I (indiscernible)?

18             MR. FORSTOT:  Yes.  Jonathan Forstot for Silar.  Good

19   afternoon, your Honor.  Just a brief technical point --

20        (Colloquy not on the record.)

21             MR. FORSTOT:  -- and then a broad point, and I'll sit

22   down as I'm sure there are plenty of people --

23        (Colloquy not on the record.)

24             MR. FORSTOT:  -- you still may want to hear from.

25        (Colloquy not on the record.)

1          MR. FORSTOT:  The technical point is that we, Silar,

2    had negotiated some changes to the proposed settlement

3    agreement.

4       I believe those are accepted by the receiver, by Compass,

5    and those really are designed, essentially, to preserve the

6    security interests and the interests of Silar as the lender

7    here, so I don't know.

8          THE COURT:  They're not noticed to putative class

9    members, and you're saying the reason is because they --

10          MR. FORSTOT:  It --

11          THE COURT:  -- don't affect them?

12          MR. FORSTOT:  Well, no.  It is the --

13          THE COURT:  What are they?

14          MR. FORSTOT:  The reason, bluntly, is that we tried

15    to get them in before --

16          THE COURT:  Uh-huh.

17          MR. FORSTOT:  -- this was sent out --

18          THE COURT:  And what --

19          MR. FORSTOT:  -- and got them in --

20          THE COURT:  What are they?

21          MR. FORSTOT:  -- in afterwards, but, essentially,

22    what it does is have a lockbox set up to preserve interests in

23    moneys coming in, a reservation of rights, you know --

24          THE COURT:  A lockbox on anything --

25          MR. FORSTOT:  -- that we have to foreclose.

```
 1                    THE COURT:  -- that goes to Compass --

 2                    MR. FORSTOT:  Yes.

 3                    THE COURT:  -- in favor of Silar.

 4                    MR. FORSTOT:  Right.  Exactly.  Just to preserve our

 5       interest in the cash collateral, and so on, all still subject,

 6       of course, you know, pending --

 7                    THE COURT:  It doesn't affect any putative class

 8       member --

 9                    MR. FORSTOT:  No.

10                    THE COURT:  -- or as to the amounts in the

11       settlement.  Just --

12                    MR. FORSTOT:  Right.

13                    THE COURT:  Um-h'm.

14                    MR. FORSTOT:  These are really between Compass and

15       Silar.  The other thing I would note -- oh, actually, you know,

16       we wanted to make absolutely clear that the vendor definition

17       did not include any lawyers who were litigating here this case

18       which I believe is what your Honor was concerned about, and we

19       wanted to make absolutely sure that that was the case.

20          (Colloquy not on the record.)

21                    MR. FORSTOT:  And I believe --

22                    THE COURT:  You lost me on that one.

23                    MR. FORSTOT:  That servicer advances are not used to

24       pay for anything for attorneys in this case in the fight that

25       we are witnessing in this case to make it absolutely clear.
```

1        I think that was the intention, but we thought there was

2    some ambiguity and then made a comment on that.  I think that

3    encompasses those changes.  That's the technical point.

4        The broad point is -- and this is really meant for both

5    sides of the room here -- you know, a settlement whether it's

6    this one or something substantially like it is what needs to

7    happen to avoid what Mr. Moore was just describing.

8        I will take issue with what Mr. Moore said.  He said

9    several times I wrote down that Compass paid $50,000,000 of its

10   money.

11       It was Silar's money.  Silar is the lender here.  Silar

12   financed it, and we continue to be prepared if necessary to

13   foreclose.

14       I don't know if that would cause more chaos or be part of

15   a solution, but that's also a possibility, something that

16   Mr. Moore alluded to, but, certainly, very real for us.

17       And we want to make sure whatever the Court decides in

18   whatever order is entered that that right is preserved because,

19   ultimately, what we're talking about here is the collateral.

20       (Colloquy not on the record.)

21          MR. FORSTOT:  Silar's collateral is being fought over

22   and diminished both by this fight and by the market forces that

23   unfortunately we've all been witnessing.

24       And that's what Silar is going to have to look to to get

25   some kind of recovery of the moneys it went out of pocket in

1    order to allow these rights to come out of what I understand

2    was a disaster called the USA Commercial Mortgage bankruptcy.

3        With regard to the other side of the room, Silar hasn't

4    even filed an answer, yet.  It hasn't asserted any

5    counterclaims.

6        We have motions to dismiss that your Honor denied without

7    prejudice.  We intend if necessary to renew them, and we have

8    some additional motions that we would be prepared to file.

9        We don't want to have to do that.  We don't think that

10   anybody's going to benefit.  Nobody's going to benefit from a

11   war here, not even as I think Mr. Moore correctly said,

12   ultimately, the lawyers.

13       What will happen is a meltdown, and everybody's going to

14   be trying to look to the same collateral to get what they can

15   to preserve what they can, and, certainly, my client will do

16   what's necessary to preserve its interests in that collateral.

17       It much prefers a solution that stops this fighting, stops

18   the litigation, stops the legal fees, stops the risks for

19   everybody.  We are where we are.  We can all argue how we got

20   here, but the best solution is a settlement.

21       And I've seen the phrase used in some of the filings and

22   some of the postings that were added to the filings as exhibits

23   a "litigation solution" as one option.  Frankly, we don't see

24   that.

25       If necessary, if pushed, we will fight.  You know, as the

1    old saying, we have not yet begun fight, well, we'll do it if

2    necessary, but we don't want to have to, and I don't think

3    anybody in this room should want to have to do that.

4              THE COURT:  Thank you.

5         (Colloquy not on the record.)

6              THE COURT:  Don't you want to respond or are you just

7    answering --

8              MR. COFFING:  No.

9              THE COURT:  -- further questions?  You want a right

10   to reply to other arguments, don't you?

11             MR. COFFING:  Your Honor, I'm just trying to get a

12   sense if with -- based upon the Court's initial comments, and

13   Mr. Moore and I have both spoken our peace, suffice it to say,

14   the rest of the attorneys in the room and the pleadings that

15   have been filed, they object to the settlement based upon not

16   only the economics, but the technical legal aspects of it.

17        And if the Court was inclined either based upon the

18   objections from the direct lenders or from the economic aspects

19   to say that the settlement is not appropriate, then it seems to

20   me that that can be done without hearing further argument.  You

21   have suggested to us --

22             THE COURT:  Why don't you let me listen to them

23   briefly.

24             MR. COFFING:  Thank you.

25        (Colloquy not on the record.)

1              MR. JUDD:  Your Honor, Spencer Judd of

2     Albright, Stoddard.  I'm here with Mark Albright.  You will

3     notice that we filed four separate motions on behalf of parties

4     that were substantially the same.

5              THE COURT:  And who do you represent?

6              MR. JUDD:  I represent direct lenders, and --

7              THE COURT:  Do you represent any, quote, unquote,

8     "financial-difficulty funds" --

9              MR. JUDD:  No.

10             THE COURT:  -- or "vulture funds"?

11             MR. JUDD:  In fact, Mr. Moore --

12             THE COURT:  Do you represent any parties who are

13    assignees from claimants in the bankruptcy court?

14             MR. JUDD:  No, your Honor.

15             THE COURT:  Uh-huh.

16             MR. JUDD:  Mr. Moore represented to the Court that

17    the majority of the objections were filed by claims traders.  I

18    have filed objections on behalf of probably about 150

19    individual parties, not claims traders --

20             THE COURT:  Um-h'm.

21             MR. JUDD:  -- parties who have invested through

22    USA Capital.  We filed four motions which were substantially

23    the same, one on behalf of Foxhills, one on behalf of

24    Shamrock Towers, one on behalf of Lerin Hills, and then a

25    fourth one with lenders from a large majority of the rest of

1    the loans.

2         Mr. Moore and others indicated -- or at least Mr. Moore

3    indicated that the loans or the responses were on behalf of

4    just claims traders or just a few.

5         I can tell you that had we allowed for a solicited -- not

6    solicited.  That's improper.  Had we allowed ourselves to

7    represent the number of people who asked us to represent

8    them --

9         (Colloquy not on the record.)

10        MR. JUDD:  -- we would have represented lenders from

11   probably all of the funds or all of the different loans and

12   substantially more than we agreed to represent in these matters

13   today, probably, in the maybe even over 1,000.

14        So for them to say that the number of people here or the

15   number of oppositions that were filed were simply on behalf of

16   "claims traders" -- I don't know if that term was used

17   derisively or not, but I'm not here on their behalf.  I'm here

18   on behalf of individual direct lenders.

19        And I apologize to the Court that we had to file four

20   separate motions that were substantially the same.  If you read

21   through those and were scratching your head and saying I've

22   read this before, a lot of it you had, but I think our point

23   was very simple.

24        The loans are very different.  There is a very distinct

25   issue amongst one loan to the next to the next, and I think the

1    law is clear, both the Ninth Circuit and in Nevada.

2         And, ultimately, these notes -- if you read through the

3    notes, all of those notes indicate they will be governed by

4    Nevada law.

5         And I think that the case in Nevada, Schutee (phonetic)

6    versus Beazer Homes, is very clear that if this Court tries to

7    put in place a class, a single class, that that's inappropriate

8    in this case at least in Nevada and under Nevada law which

9    governs these notes.

10        And I think the Ninth Circuit also has been very clear

11   that that's inappropriate in a case like this where money

12   damages prevail, and this isn't an issue of injunctive relief.

13   That that doesn't predominate in these claims.

14        If you, your Honor, look at our briefs, particularly, the

15   four -- we filed a couple of other briefs, one on behalf of

16   Stuart Madsen where we attached his comments as an attachment

17   to the brief and on behalf of the Riegers.

18        But I think you'll find if you read through our briefs,

19   the other briefs, there is a couple of things that are very

20   clear.

21        One, the settlement agreement itself is unconstitutional

22   if it's crammed down.  Now, is it equitable?  Is it something

23   that should be accepted by the direct lenders?

24        I don't know, and I don't think that they know until it's

25   broken out by loan who's going to pay what and who's going to

1    receive what, but there are loans where they have substantial

2    claims against Compass.

3        We outlined a couple of those in our briefs where the

4    claims are there.  Are they valid?  I don't know.  Should they

5    be litigated?

6        I don't know, but it's certainly not something to cram

7    down a settlement on those direct lenders when they haven't had

8    an opportunity to be heard.

9        Shamrock, the property was sold.  The money is sitting in

10   a fund.  What's to be determined in that one?  The waterfall

11   issue.

12       He indicated I don't know what the waterfall is.  We need

13   to determine whether or not they have a right to some of those

14   fees.  Do they or don't they?  I don't know.

15       Could that be settled?  Maybe.  With 51 percent of the

16   direct lenders agreeing to it, we probably could reach some

17   sort of settlement.

18       But to cram down a settlement where it says they have to

19   pay a certain amount, I think that all of them are going to say

20   that's inequitable if it takes into account other loans that

21   have different claims.

22       Foxhills, Foxhills had property that was foreclosed upon.

23   It's now the property itself is sitting in a special-purpose

24   entity, a Compass special-purpose entity.

25       Did they terminate Compass as the servicer?  I don't know.

1    What are they servicing now?  They simply have this property.

2    It needs to be marketed and sold or held on to until the market

3    rebounds.

4         Are there tort claims?  There may be.  I think it's up to

5    the direct lenders in that particular loan to determine do they

6    want to pursue those or do they want to accept their

7    pari passu, their own little piece of that $6,000,000?  I don't

8    know.  They may think that their court claims exceed that.

9         Mr. Moore indicated, hey, there's no money in Compass.

10   It's a special-purpose entity.  You know, that's something they

11   have to determine, but I don't think that a settlement on their

12   behalf should be crammed down.

13        Lerin Hills, there is nothing there.  That's one where the

14   lenders now need to determine do they have and do they want to

15   pursue claims against Compass.

16        For them to pay part of that 34.5 million dollars for

17   something that they don't have any loan now or any security for

18   their loan, you know, that's something that you're asking a

19   pretty big thing of them if the settlement is approved.

20        And then a number of other lenders that we represent in

21   all sorts of different scenarios in other loans, and I think

22   that that settlement agreement at least the terms without a

23   definition who gets what simply can't be approved by the Court.

24        The class action, I think we briefed it pretty thoroughly

25   for your Honor.  A class action with one class simply doesn't

1    fly in this circuit and in this state.

2        Subclasses, we wanted to give to your Honor an

3    alternative, and I think that there is an argument that

4    subclasses could fly here with an opt-out.

5        Each loan, loan by loan, allow the direct lenders in those

6    loans to vote, determine whether they want to be part of the

7    class or not, determine whether they want to make settlements

8    or not.

9        I think that the case law -- and we've been pretty

10   thorough.  I think we cited 43 cases and a number of statutes

11   and other things, not on that issue alone, but, substantially,

12   for that issue.

13       I think the case law is pretty clear that a single class

14   can't happen, but subclasses could, but there must be an

15   opt-out, and I think that that has to be part of any kind of a

16   class if the Court determines that that's appropriate.  That

17   there must be something allowing them to opt out upon a vote of

18   the direct lenders or the owners of those loans.

19       Your Honor, I don't think that their representations that,

20   you know, the attorneys are the only ones that are going to

21   make out here.  I don't think the direct lenders want the

22   attorneys to be the only ones that make out.  They want a

23   resolution.

24       I have heard it from dozens and dozens and dozens of

25   direct lenders, and I have had a little piece of this

1    litigation all the way back since this was filed.  The case was

2    filed by USA Capital.  But I think to a person, every one of

3    the direct lenders wants this resolved.

4         The question is what's appropriate, and I think that's

5    what you're struggling with here.  What is appropriate?

6    Certainly, a class, a single-class action, cramming down a

7    settlement can't be that solution.

8         The waterfall issue, it never has been addressed at least

9    in a setting where there's a final resolution of that.  Does it

10   need to be?  I don't know.  But by loan by loan by loan, that

11   needs to be resolved.

12        Your Honor, I will represent to this Court I represent

13   direct lenders in the Standard Property loan.  The direct

14   lenders were sued by the borrower.

15        The borrower sued them because the borrower did not

16   receive all of the money that USA Capital represented to them

17   that they were going to get.  They sued the direct lenders.

18        The direct lenders agreed, ultimately, during the course

19   of that litigation to accept as their settlement 100 percent of

20   the principal.

21        The direct lenders to a person waived their interest and

22   fees on that loan.  That loan ultimately was paid off by

23   Standard Property borrowers.

24        But from what I have been told -- and I don't have any

25   direct knowledge of this.  But from what I have been told by

1    the attorney for Standard Property and from others who I have

2    spoken with, the documents releasing the collateral on that

3    property were not going to be released by Compass until

4    additional interest and fees were paid by the direct lender --

5    or excuse me -- by the borrower, so they "coerced". I don't

6    know what word is appropriate there.

7              THE COURT: They've got a right to do that.

8              MR. JUDD: Do they have a right? That's a question.

9              THE COURT: Yes, they do.

10             MR. JUDD: Under --

11             THE COURT: And I've already answered that question.

12   They have a right. They purchased the servicer right, and the

13   servicer has the right under some of these notes, not all of

14   them --

15             MR. JUDD: Oh.

16             THE COURT: -- to default interests and/or servicing

17   fees.

18             MR. JUDD: Okay.

19             THE COURT: I have already answered that question.

20             MR. JUDD: For the Standard Property --

21             THE COURT: You just --

22             MR. JUDD: -- that one has been --

23             THE COURT: You just haven't heard it.

24             MR. JUDD: I have not heard that, and I didn't know

25   that there was a hearing on that where those documents were

1    presented to your Honor.

2                THE COURT:  That's a nice way to rephrase it, but you

3    heard what I said.

4                MR. JUDD:  Okay.  There is a lot of other loans where

5    that issue has not been determined where the documents are not

6    exactly the same as those documents of Standard Property.

7         Each of the direct lenders has a different servicing

8    agreement.  Some of those that I represent today have servicing

9    agreements that have one percent, two percent, three percent.

10   Some of these of who I represent today have no servicing

11   agreement for one or more of their loans.  The question is what

12   do they owe?  How much of that 34-and-a-half million should

13   they be obligated to pay?

14        Those are questions I don't think that this Court in this

15   setting today without subsequent hearings is in a position to

16   tell us that we have all of the answers to be able to do that

17   today.

18        I don't know that, you know, class counsel, the

19   determination on that.  Who's going to represent whom?  Is it

20   simply one counsel or are each of the direct lenders going to

21   be allowed something different?

22        You know, those are types of things I think that in a

23   subsequent briefing should be allowed to be brought out.  Do we

24   want this extended and protracted out to where there's, you

25   know, just attorneys making money on this?  No.

```
 1          But I don't think with what was presented to this Court as

 2     an emergency motion at this point is sufficient for this Court

 3     to order a class action and cram down a settlement upon these

 4     people who have had no notice and have not had the opportunity,

 5     one, to opt out or to approve or to make any kind of a comment

 6     on that settlement other than those who have hired counsel, not

 7     only those who represent the classes or those who have bought

 8     up interests in others, but those who invested themselves as

 9     have our clients.

10          THE COURT:  Thank you.

11     Thank you.  Good morning.

12          MR. BRUGGENWIRTH:  Good morning, your Honor.

13     David Bruggenwirth.  I'm here on behalf of Sierra Liquidity

14     Fund.

15          However, if it may please the Court, I would prefer to

16     have Mr. James Riley, manager thereof, to address the Court.

17     His understanding of the facts is very deep, and his experience

18     I believe will be very helpful in helping this Court --

19          THE COURT:  I don't think --

20          MR. BRUGGENWIRTH:  -- to understand --

21          THE COURT:  -- I should do that --

22          MR. BRUGGENWIRTH:  -- the relevant --

23          THE COURT:  -- if you are designated counsel --

24          MR. BRUGGENWIRTH:  -- facts.

25          THE COURT:  -- for that --
```

```
 1              MR. BRUGGENWIRTH:  Well, just for --

 2              THE COURT:  -- party.

 3              MR. BRUGGENWIRTH:  For this hearing, but, again, I

 4      believe that his understanding and experience with the case and

 5      with these facts will be able to help this Court better

 6      understand the facts --

 7              THE COURT:  Is he --

 8              MR. BRUGGENWIRTH:  -- that are --

 9              THE COURT:  -- an attorney?

10              MR. BRUGGENWIRTH:  Your --

11              THE COURT:  Is he an attorney?

12              MR. BRUGGENWIRTH:  He is not, your Honor.

13              THE COURT:  And his fund does have an attorney hired,

14      designated, and who has filed pleadings.  I'm sorry.  I'm going

15      to deny the request, but you certainly may be heard.

16              MR. RILEY:  I --

17              MR. BRUGGENWIRTH:  Well, if --

18              MR. RILEY:  Can I represent myself --

19              MR. BRUGGENWIRTH:  If I may reserve --

20              MR. RILEY:  -- as a direct lender?

21              THE COURT:  I'm sorry, sir?

22              MR. RILEY:  I have a personal interest in the

23      settlement (indiscernible).  May I represent myself as a direct

24      lender?

25              THE COURT:  But this is your attorney, right?
```

```
1              MR. RILEY:  The -- the Sierra Liquidity Fund, but not
2     -- not my personal one --
3              THE COURT:  Uh-huh.
4              MR. RILEY:  -- for my personal interests.
5              MR. BRUGGENWIRTH:  Your --
6              THE COURT:  No, sir.
7              MR. BRUGGENWIRTH:  And, your Honor, if I may --
8              THE COURT:  No.
9              MR. BRUGGENWIRTH:  -- reserve --
10             MR. RILEY:  I have a very short comment --
11        (Colloquy not on the record.)
12             MR. RILEY:  -- your Honor.
13             THE COURT:  I --
14             THE COURT RECORDER:  Sir, please move closer --
15             THE COURT:  I appreciate --
16             THE COURT RECORDER:  -- to the microphone.
17             THE COURT:  -- that you do.  The answer of the Court
18     is no, but I do want to hear from your counsel.
19             MR. BRUGGENWIRTH:  Okay.  Your Honor, if I may
20     reserve rights to speak later --
21        (Colloquy not on the record.)
22             MR. BRUGGENWIRTH:  -- if it is appropriate, please?
23             THE COURT:  Yes.
24             MR. BRUGGENWIRTH:  Thank you.
25             THE COURT:  Uh-huh.
```

1        UNIDENTIFIED SPEAKER:  (Indiscernible).

2        (Colloquy not on the record.)

3        MR. LANGBERG:  Good afternoon, your Honor.

4        THE COURT:  Good afternoon.

5        MR. LANGBERG:  Mitchell Langberg, Brownstein, Hyatt,

6   Farber, Schreck representing several direct lenders and a

7   vulture fund, the Platinum entities.

8        And when I say vulture fund, your Honor, as you know, what

9   that means without knowing anything about the deals that were

10   made is a company that went to direct lenders who preferred to

11   liquidate their positions, rather than be involved, you know,

12   in the uncertainty of all of this and did it on a negotiated

13   basis.

14        And as far as I know, none have challenged the contract as

15   unconscionable or anything of that nature, so maybe we'll just

16   say direct lenders in successor interests.

17        There is two things I'd like to do.  A lot has been

18   discussed about the class and the standards of the class which

19   I think are well-briefed.

20        And I don't really have anything to add about them, except

21   to the extent that we all know that the fairness,

22   reasonableness, and appropriateness of the settlement that's

23   being proposed is relevant to the analysis even at this state.

24        And I'd like to frame issues that have been discussed

25   loosely, but I'm not sure have ever been well-framed, and that

1    is that Compass had -- there's two kinds of fees as we all

2    know.

3         There are what Compass has referred to as the fees that

4    are not "in dispute," and I'll put that in quotes for the

5    moment.  That is their servicing fees and advances.

6         And then there are the disputed amounts which we refer to

7    as the waterfall which really are default interest and late

8    fees.

9         Now, there may be disputes to be had.  There are regarding

10   the servicing fees and advances, not Compass' contractual right

11   to those, but whether or not because of its conduct as a

12   servicer Compass is in a material breach and, therefore, may

13   suffer damages or may suffer an award of damages or equitable

14   offsets for those.  That was part of the termination hearings

15   your Honor was going to have.

16        (Colloquy not on the record.)

17        MR. LANGBERG:  But at least on behalf of my clients,

18   I do not stand here today saying that Compass is not

19   contractually entitled to servicing fees.

20        But critical to this analysis, your Honor, is the

21   waterfall portion, and the reason that it's critical is because

22   there is great dispute as to when and whether Compass is

23   entitled to any of the default interest and late fees if the

24   full principal amount let alone regular interest is not

25   collected from the borrower.

1        Now, as we stand here, I think I heard counsel talk about

2    we have not yet begun to fight.  And to articulate on behalf of

3    the lenders I have spoken to -- and by the way, your Honor, if

4    my firm was willing to risk the conflicts of 5 to 750 clients

5    for one motion, maybe we would have had that many as well.

6    There were a lot of people disappointed in those.

7        One of the reasons that we have a vote if we're going to

8    have a vote as opposed to a non-opt-out is so that these silent

9    people can be heard from.

10       But counsel says we have not yet begun to fight, and what

11   I hear from the lenders is more like what a general said during

12   World War II when surrounded by the German army and offered

13   unconditional surrender for the safety of his troops, and he

14   said nuts because as to the 34.5 million dollars that Compass

15   wants to get for the default interest and late fees my client,

16   direct lenders, don't understand why they think they should

17   have any of it, and that is something they want their day in

18   court for.

19       They look at their contracts, and they see that if Compass

20   is allocated these default interest and late fees at all

21   because some loan-servicing agreements don't that it says only

22   if they're collected from the borrower, and they look at

23   promissory notes that say that first moneys will go to the

24   principal.

25       And so that issue to me is the most critical issue that

1    creates all of the objection because that issue where a

2    settlement is supposed to create certainty, in this proposed

3    settlement, the issue that is the central issue to many of the

4    lenders is the issue that is unsettled and uncertain.

5        They know that there is a 34.5-million-dollar amount.

6    They don't know how much will be allocated to their own loan.

7    They don't know how much will be allocated to them.

8        The allocation or the amount is locked and guaranteed.

9    Compass will be assured payment of the 34.5 million dollars.

10    It doesn't say what happens if the estimated value that Compass

11    assigns is too high, and they collect half or a quarter or

12    none.

13        And in my mind, your Honor, this entire amount or the only

14    inhibiting factor to coming to a resolution where lenders can

15    either get behind it or not is the fact of this uncertainty.

16    Excuse me.

17        (Colloquy not on the record.)

18        MR. LANGBERG:  Remember, your Honor, these people are

19    in place where they lost control a long time ago.  They lost

20    control when they had loans that they thought were properly

21    documented and properly being maintained only to find out that

22    they were subject to a Ponzi scheme.

23        (Colloquy not on the record.)

24        MR. LANGBERG:  They lost control later when they

25    thought that they had -- many of them coalesced into a group to

1    bring claims before the Court only to find out that for legal

2    technical reasons the forum that they came before the Court,

3    these LLCs, not because they were LLCs, but because of the way

4    they were managed and funded were not acceptable.

5        And then at the same time that the LLCs were basically

6    dissolved and reinstituted before having a chance to come up on

7    their own to determine whether or not they could coalesce

8    together again and hire counsel the receiver was put in place.

9        And now the proposal -- and because it's the best that

10   Compass -- Compass has told you this is a line in the sand.

11   The best that Compass can come up with is a settlement that's

12   being proposed that they not even have the option to opt out

13   of.

14       And so one wonders why the Court has hundreds and hundreds

15   of letters and why the trustee -- the receiver -- excuse me --

16   bulletin board has much objection and why there are no vocal

17   supporters.

18       I don't think we should assume that the supporters aren't

19   vocal because they know it's being handled by the motion.  I

20   don't think that's fair.

21       And so I think before the Court because I think it's

22   apparent that there is issues with this is the more practical

23   problem of what do we do.

24       Do we have several subclasses?  Do those subclasses really

25   get something that consolidation of claims wouldn't solve if

1    people were allowed to again select their own counsel and bring

2    their claims and allow this Court to make an analysis on a

3    loan-by-loan basis?

4        Something like the waterfall issue which now should

5    clearly be viewed as the uncertainty that prevents resolution

6    of this case, should that be teed up for a resolution before

7    termination hearings because, frankly, your Honor, depending on

8    how the Court would rule on a waterfall termination may be

9    voluntary.  Excuse me.

10       Ultimately, the question for the people is how do they get

11   their day in court if they want it or vote and select the fair

12   settlement.

13       And this process, your Honor, that's been place for the

14   last 60 days though obviously well-intentioned, obviously, I

15   have no doubt that the Court and the receiver are interested in

16   protecting the direct-lenders' interests.  But this solution,

17   it didn't work.

18       The last point I wanted to make, your Honor, is while --

19   and I guess I need to separate out again.  The waterfall issue

20   is one where as I understand it the direct lenders feel firmly

21   that they have a full entitlement.

22       The other issues they recognize, and they hear Compass

23   saying -- now they will hear, and I'm afraid, frankly, that

24   what counsel's comments will be interpreted -- though I don't

25   think they were that -- interpreted as some kind of a

1    thumb-nosing of if you pursue us, well, we don't have anything

2    for you to get at, so take this bad settlement.

3         And, your Honor, let's remember Compass has they say

4    $15,000,000 in servicing fees coming to them.  They have they

5    say $15,000,000 of advances coming to them.

6         And, your Honor, when they say they have $50,000,000

7    invested that they're going to lose on, they forget to mention

8    that the vast majority of that, arguably, is attributable to

9    the fact that they purchased equity interests in these loans to

10    be in just as a risky place as all of these lenders, so there

11    are many assets there.

12         And if the lenders want to fight with them and bring tort

13    claims and have risks of bankruptcy and recovery, then that

14    should be their prerogative.

15         But, again, I will emphasize to the Court I believe that

16    what is driving the objection is the fact that there's a

17    waterfall issue, a $167,000,000 issue according to the

18    receiver's papers.

19         That this waterfall issue is uncertain today.  Until it is

20    litigated by this Court and ruled on by this Court, it will be

21    uncertain tomorrow.  And even in the settlement, it remains

22    uncertain.

23         And there's only three to four different loan-servicing

24    agreements that exist in order to interpret what waterfall

25    rights there are, if any.

```
 1        So for all the reasons that have been stated in the

 2   papers, I think that the class approval, the class

 3   certification, should be denied, most importantly, if for no

 4   other reason because the settlement is not fair and reasonable.

 5        THE COURT:  Thank you.

 6        Should we take a recess for a lunch hour?  Let's come back

 7   in an hour and a half, please.  I'll ask you to come back at

 8   2:30.

 9        (Colloquy not on the record.)

10        THE CLERK:  All rise.

11        (Recess at 12:49:53 p.m.)

12        (Thereupon, Lisa L. Cline concluded as transcriber,

13        and Michele Phelps commenced as transcriber.)

14        (Court reconvened at 02:30:08 p.m.)

15        THE CLERK:  All rise.

16        (Colloquy not on the record.)

17        THE COURT:  Thank you.  Please be seated.

18        (Colloquy not on the record.)

19        THE COURT:  And you may continue, please.

20        (Colloquy not on the record.)

21        THE COURT:  Thank you.

22        MR. KIRBY:  Good afternoon, your Honor.  Dean Kirby.

23   I'm here representing DAC, Debt Acquisition Company of America.

24        I wanted to first agree with the Court that there can

25   either be a settlement or a resolution of this case under
```

1    Rule 23.  If it's rigorously applied as the cases say, that it

2    must be rigorously applied.

3        This class in our opinion has not been carefully-enough

4    defined and the settlement not carefully-enough structured at

5    this point to assure fairness to all the parties who are in

6    different circumstances.  This is a complex case, but it's not

7    less complex than many that are handled well under Rule 23.

8        And as a lawyer that doesn't practice in class actions all

9    the time, as I read many, many cases on class actions, I have

10   read of cases with lots of subclasses and complex structures

11   that were designed to address exactly some of the same issues

12   that are present here.

13       And there's no reason why that can't be done here.  If the

14   shortcut is blocked, then this rule is going to be applied

15   properly and rigorously as it should be.

16       Specifically, subclasses should be designated on

17   loan-by-loan basis, and there should be a class representative

18   for each one.

19       An ADR should be quickly had loan by loan.  And in the

20   meantime, any specific loan-servicing problem or issue can be

21   brought to this Court if necessary just as has always been the

22   option of anyone.

23       And what we have seen in the interim as this has been in

24   place are, you know, fairly as Mr. Moore pointed out a great

25   deal of loan-servicing problems and issues be resolved, many

1   with lender consent.

2       And I stand before the Court representing a firm that owns

3   58 percent of one of these loans, and that's the Fiesta

4   Stoneridge loan, and that was one of the loans that Mr. Moore

5   told the Court was resolved.

6       And by resolved, I know he meant that my client

7   representing 58 percent of the interests in that loan consented

8   to a sale and agreed with Compass on how much money should be

9   distributed immediately and how much should be escrowed pending

10  a resolution of these other issues.

11      And we are prepared to go forward to resolve these matters

12  in a similar spirit and a similar fashion under an appropriate

13  structure, and this resolves if we proceed in this way a major

14  legal problem, and that is what we've said to the Court.  That

15  it's a violation of Rule 23 to appoint a fiduciary, a volunteer

16  fiduciary, to act as the sole class representative.

17      It's an important safeguard in Rule 23 that a class

18  representative has to be a member of the class.  That the class

19  representative actually suffered the harm that was suffered by

20  the class.

21      It's convenient to do it another way.  It's less rigorous,

22  but it's fatally legally flawed to do it another way.

23      The motion needs to be denied right now at this point, and

24  the denial of this motion would send a message to Compass that

25  it has to go partially back to the drawing board, but, also, to

1    the direct lenders who have not ever won a victory that they

2    can remember even though I think that this Court has their

3    interests very much at heart.

4        It needs to be denied in a way that shows the past to

5    finishing this, and what has happened as a result of the

6    receiver's efforts which I in no way demean -- I think he's

7    taken us a good way down the road here -- is that the people

8    who had no stake in the battle between Donna Cangelosi and

9    Compass are now as a result of this motion being filed now

10   before the Court.

11       And there's a list of people who filed papers and who are

12   appearing, and, you know what, it's a short list.  It truly is

13   a relatively-short list.  And it's a group that can work

14   together to settle this case in a way that makes a problem of

15   opt-out, for example, a lot less of a problem than it is as

16   this settlement is postured now and as this case is postured

17   now before your Honor.

18       Thank you very much.

19       THE COURT:  Thank you.

20   (Colloquy not on the record.)

21       THE COURT:  Ms. Chubb.

22       MS. CHUBB:  Good afternoon, your Honor.  You sent us

23   to mediate, and we did, and that was a really good idea, and I

24   can assure the Court that everyone worked very, very hard at

25   that.

1     Certainly, Judge Nakagawa was most helpful, and Fulbright
2     did a great job, and Mr. Grimmett agonized over whether to come
3     to this kind of an acceptance of the proposal, and maybe
4     Compass worked hardest of all.  But when we walked out of
5     there, what we had was a proposal for the direct lenders with
6     an opt out.
7          Since then, it has morphed into no opt-out, and it's now a
8     settlement agreement.  And in order to have an agreement, you
9     have to have the parties involved in that, and the idea of just
10    making the direct lenders take this seems unfair.
11         My clients, for instance, have been paying me every month
12    for two years to do this.  They're now going to be asked to pay
13    another one percent if they can't opt out, their portion of the
14    15,000,000 for servicing fees.
15         And I think those servicing fees are accrued on a monthly
16    basis irrespective of how much money comes in on the loan.  I
17    think that's all added in there -- then another 15,000,000 for
18    the advances which we've never challenged, although they're
19    going to be audited, and then another 28,000,000 for getting
20    Compass out.
21         At the inception of the mediation, my question was what
22    does it take to get Compass out.  And at the end of the sixth
23    day, we had that figure.  It takes it was $34,000,000.
24         Now maybe it's 28,000,000 to get Compass out, but that was
25    with an opportunity to opt out for anybody who wanted to.  I --

```
 1              THE COURT:  What's the effect --

 2              MS. CHUBB:  It seemed --

 3              THE COURT:  -- of opting out?  I mean, this is a

 4    declaratory -- the plaintiffs are suing for termination.  This

 5    is an action for declaratory relief, so what is the effect of

 6    opting out?

 7              MS. CHUBB:  If they have claims against Compass, they

 8    would be able to pursue those, and they --

 9              THE COURT:  But how could --

10              MS. CHUBB:  -- don't have --

11              THE COURT:  -- they have the right to seek

12    termination separate and apart from a class that's approved

13    from which they have the opt-out right?  If a class that's

14    approved and pursuant to a settlement there's a termination,

15    what are they opting out of?

16              MS. CHUBB:  Well, they're not opting out of

17    termination.  They're opting out of giving their money, so

18    they're precluded from suing Compass.  I --

19              THE COURT:  But they --

20              MS. CHUBB:  I wonder --

21              THE COURT:  -- also cannot inherit the right of

22    opt-out for them because, of course, there's no settlement for

23    someone who opts out, so does that mean that termination

24    doesn't exist for them?  That they still have to engage and use

25    Compass unless and until some other Court terminates a
```

1    servicer's rights?

2              MS. CHUBB:  I --

3              THE COURT:  What does it mean to opt out?

4              MS. CHUBB:  I don't think it -- I think it could be

5    structured in such a way that, yes, they go on to the new

6    servicer if the receiver should find a new servicer.

7              THE COURT:  Then they're accepting the settlement

8    other than, of course, the monetary compensation to be paid by

9    Compass and, of course, the receiver to Compass.  Other than

10   the monetary elements, they're accepting the settlement --

11             MS. CHUBB:  Well --

12             THE COURT:  -- if they opt out.

13             MS. CHUBB:  -- if they opt out, they are accepting

14   that Compass is going away.

15             THE COURT:  I --

16             MS. CHUBB:  But they're not --

17             THE COURT:  I don't know how we can do that.  I don't

18   know how we can say as to a person who opts out the settlement

19   still binds Compass.

20             MS. CHUBB:  Well, it's really interesting here

21   because I don't know that I've ever seen a class action where

22   the plaintiffs pay the defendants, and you can't say no to

23   that.  It's rather strange.

24             THE COURT:  Well --

25             MS. CHUBB:  And I'm not --

1          THE COURT:  -- what it is, it's a declaration.

2    That's the primary relief sought, really, by both sides.  That

3    is there's a declaration that Compass, generally, or if I

4    insist upon subclasses note by note is either a continuing

5    servicer or is not.  That's the primary relief sought by sides.

6          MS. CHUBB:  Well --

7          THE COURT:  You know, Compass sought injunctive

8    relief, don't interfere with our servicing rights, the other

9    parties to the extent they filed a claim and, incidentally,

10   damages for those who have interfered.

11       And the direct lenders and/or LLCs who filed suit sought

12   declaratory relief, hey, you don't have the right to be our

13   servicer, number one, and, number two, you don't have the right

14   to collect fees.  So even if you continue as our servicer in

15   negotiating payoffs, you don't have the right to collect our

16   fees, so my point is both sides sought declaratory relief,

17   primarily.

18       What is the effect of a failure of the class, number one?

19   And it seems the effect of a failure or of an opt-out, rather,

20   is simply that they have to pursue their rights elsewhere,

21   including termination.

22          MS. CHUBB:  Well, maybe they do, but I would say,

23   your Honor, that having a non-opt-out class created which is

24   taking this, quote, "settlement" in which they had no say is

25   just more of what everyone of them has gone through, already.

1          THE COURT:  But that's what we're seeking now, and --

2          MS. CHUBB:  I understand.

3          THE COURT:  And I'm relying heavily upon you,

4    Ms. Chubb, because I really think that you have a long

5    background in the case, and you represent sincerely the

6    interests of direct lenders.

7          But the options for the Court -- I mean, I have already

8    said I'm not particularly enamored with the way this settlement

9    is structured and with the support for it.

10         But with respect to a settlement, generally, and class

11   certification, counsel is correct in the options, the

12   alternatives, that they've listed.  One very likely scenario is

13   Silar will foreclose, and Compass will file a bankruptcy --

14         MS. CHUBB:  I --

15         THE COURT:  -- in order to stop that, and then where

16   are we?

17         MS. CHUBB:  I understand.

18         THE COURT:  The whole idea of Judge Riegle rightly or

19   wrongly in choosing Compass, the whole idea was to cut a

20   bankruptcy proceeding short.  That was the whole idea.  That's

21   why she thought and still thinks I'm sure that she was correct

22   in confirming the plan.  And, of course, she did it with vote.

23         Now, the vote might be very different today, but she did

24   it with a vote of the various classes.  The whole idea was to

25   turn what otherwise would have been a two-year -- yours and my

```
 1    experience was five years -- proceeding and many tens of

 2    millions of dollars --

 3              MS. CHUBB:  Yes.

 4              THE COURT:  -- of attorneys fees, a potential rollup

 5    of the interests -- we all know what that means -- versus an

 6    alternative of a nine-month exit to a bankruptcy.

 7         Now, the mistake if she made a mistake was accepting the

 8    bid of Compass if she made a mistake, but cutting the

 9    proceedings short was not a mistake.

10         It seriously, drastically limited the fees that otherwise

11    would have gone to counsel and reorganizing.  You know that.

12    I'm talking to the choir right now in telling you that, so that

13    wasn't a mistake.

14         And the problem here that counsel have cited for me, the

15    terrible opening of the floodgates if I don't approve the

16    settlement, is a very realistic possibility.  You'll just be

17    right back in a bankruptcy.

18              MS. CHUBB:  Well, okay.

19              THE COURT:  They'll never see the proceeds.

20              MS. CHUBB:  Then how about we look again at the class

21    action?

22              THE COURT:  I agree.

23              MS. CHUBB:  We implore the Court to decide on very

24    narrow issues on summary judgment the different classes based

25    on the way the promissory notes are drawn and the LSAs, really
```

1    simple.  It's submitted.  You decide it, and then we come up

2    with a plan that treats --

3              THE COURT:  You mean --

4              MS. CHUBB:  -- all of those people --

5              THE COURT:  -- go ahead to the litigation.

6              MS. CHUBB:  No.  I don't mean -- no.

7         (Colloquy not on the record.)

8              MS. CHUBB:  I'm saying just a summary judgment on

9    those issues.

10             THE COURT:  I've already really broadcast.

11   Obviously, the parties weren't listening to me.

12             MS. CHUBB:  No.  We --

13             THE COURT:  But I've really broadcast the way I'm

14   going to rule on this waterfall issue.

15             MS. CHUBB:  Yes.

16             THE COURT:  I've told everybody --

17             MS. CHUBB:  Well, but the notes --

18             THE COURT:  -- how I'm going to rule.

19             MS. CHUBB:  I --

20             THE COURT:  I haven't told you note by note what the

21   ruling is.

22             MS. CHUBB:  I know.

23             THE COURT:  But I have told you --

24             MS. CHUBB:  But don't you think --

25             THE COURT:  -- how I'm going to rule.

```
 1              MS. CHUBB:  -- we have to then divide the classes
 2      into notes which are differently affected?
 3              THE COURT:  Yes, I do.
 4              MS. CHUBB:  And we still need the Court's input on
 5      that.
 6              THE COURT:  I agree.
 7              MS. CHUBB:  Just saying let us have that little
 8      summary-judgment hearing.
 9          (Colloquy not on the record.)
10              MS. CHUBB:  And then maybe there is a --
11              THE COURT:  A summary judgment on termination rights?
12              MS. CHUBB:  No, no, no.  No, no.
13              THE COURT:  Oh.
14              MS. CHUBB:  No.
15              THE COURT:  The summary judgment --
16              MS. CHUBB:  We don't --
17              THE COURT:  -- on the waterfall?
18              MS. CHUBB:  No.  On --
19          (Colloquy not on the record.)
20              THE COURT:  Certification and settlement.
21              MS. CHUBB:  That, too, but part of that --
22              THE COURT:  That's what we're doing today.
23              MS. CHUBB:  -- would be based on how the notes are
24      drawn and how they are different and how that affects Compass.
25              THE COURT:  Summary judgment means to me that you
```

```
 1        want judgment on the issues at stake here in this case.  That

 2        is termination, waterfall --

 3                MS. CHUBB:  Not termination.  You know, I think this

 4        is workable.

 5                THE COURT:  But waterfall.

 6                MS. CHUBB:  Well, based on the notes and based on --

 7                THE COURT:  In other words, even if there are

 8        subclasses, even if there's different structuring which I'm

 9        going to undoubtedly going to require here, if I reject the

10        settlement and go to summary judgment, we have no settlement,

11        and we're right facing the very prospect that I just talked

12        about.

13                MS. CHUBB:  Well --

14                THE COURT:  You're going to be in another bankruptcy.

15                MS. CHUBB:  What is the --

16                THE COURT:  You'll be out of this court.  You folks

17        may want that, but it will be in another bankruptcy in front of

18        a bankruptcy you judge --

19                MS. CHUBB:  Well --

20                THE COURT:  -- maybe in Delaware --

21           (Colloquy not on the record.)

22                MS. CHUBB:  I've never been there, so --

23                THE COURT:  -- or New York, and --

24                MS. CHUBB:  You --

25                THE COURT:  And you'll --
```

```
1              MS. CHUBB:  You --

2              THE COURT:  -- have to travel there.

3              MS. CHUBB:  Well, you know, you can raise all of the

4      horror stories, and I've been through the entire mediation.

5              THE COURT:  The --

6              MS. CHUBB:  So I've heard --

7              THE COURT:  The problem is in this case they're not

8      potential horror stories.

9              MS. CHUBB:  And I'm not saying this can't be worked

10     out, but I'm saying we need a little more direction from the

11     Court, and I think Mr. Coffing can outline that better because

12     I think there is a summary-judgment motion floating around out

13     there.  But if you --

14             THE COURT:  Again, a summary judgment on the core

15     issue of the waterfall.

16             UNIDENTIFIED SPEAKER:  Yes.

17             MS. CHUBB:  Yes, and how the different LSAs are

18     written and who gets what and what they get to decide because

19     then as you pointed out we didn't have a statistical basis --

20             THE COURT:  Uh-huh.

21             MS. CHUBB:  -- for the number we came up with.  It

22     was --

23             THE COURT:  Well, I can give you a summary judgment.

24     Of course, there will be no settlement.  There may be before I

25     ever have time to enter the judgment or you proceed to appeal.
```

```
 1    Of course, there may be a bankruptcy, and it will take it away

 2    from me.  I won't be deciding the issue nor will the Ninth

 3    Circuit.

 4         (Colloquy not on the record.)

 5              THE COURT:  But I could give you a judgment, but that

 6    simply forms the basis just to appeal.  You can go on to

 7    appeal.  Either side can go on to appeal.  There will be no

 8    settlement, and you'll just be held up.

 9         How long does it take to get an appeal through the Ninth

10    Circuit?

11              MS. CHUBB:  Oh, you know it takes forever.

12              THE COURT:  That's right.

13              MS. CHUBB:  Yes.

14              THE COURT:  And then back down here.  That's assuming

15    no bankruptcy is filed.

16              MS. CHUBB:  I'm not --

17              THE COURT:  And if there's a bankruptcy, we're

18    talking about years hence.

19              MS. CHUBB:  It's not that bad.  It's not --

20              THE COURT:  It's not that bad?

21              MS. CHUBB:  -- that good here because as you've

22    pointed out we don't have a statistical analysis --

23              THE COURT:  Right.

24              MS. CHUBB:  -- to justify --

25              THE COURT:  We need that.
```

```
1          MS. CHUBB:  -- the number we came up with --
2          THE COURT:  We need that.
3          MS. CHUBB:  -- because we went in to make a deal, and
4     Mr. Grimmett worked as hard as he possibly could --
5          THE COURT:  You didn't --
6          MS. CHUBB:  -- and got --
7          THE COURT:  You didn't come up with enough.
8          MS. CHUBB:  Well, there are people who aren't happy
9     with this.
10          THE COURT:  That's right.
11       (Colloquy not on the record.)
12          MS. CHUBB:  And to say without even the process of a
13     plan and reorganization you're taking this no matter what is
14     just --
15          THE COURT:  Uh-huh.
16          MS. CHUBB:  -- bad.  At this point, it's just --
17          THE COURT:  No.  I agree with you.
18          MS. CHUBB:  -- not good to do that with --
19          THE COURT:  But versus a total negation of a
20     settlement, the option, the alternative for me, really is --
21     you know, I can duck the issue.  I don't have to.  It will just
22     end up in another court.
23          MS. CHUBB:  That's true.  Okay.  But if you gave us a
24     little more guidance, and we got some different classes in the
25     proposed settlement --
```

```
 1              THE COURT:  Uh-huh.
 2              MS. CHUBB:  -- we might well be able to resolve
 3     this --
 4              THE COURT:  But you understand --
 5              MS. CHUBB:  -- with most of the people.
 6              THE COURT:  -- that the guidance I give you won't be
 7     on a note-by-note case.  I can't proceed to litigate the case.
 8     Summary judgment is litigation.
 9              MS. CHUBB:  It is.
10              THE COURT:  It's just short of the trial is all.
11     And, of course, you know, very likely, a response you're going
12     to get is I can't grant summary judgment because there are
13     material issues.  In other words, on a note-by-note case, there
14     may be some notes where I can grant judgment.  You know, the
15     note's already been collected.
16         Compass doesn't dispute or the direct lenders don't
17     dispute here is X dollars you can keep or you can't keep
18     anything other than servicing fees and advance fees, but I
19     can't give you -- short of just negating totally settlement, I
20     can't give you judgment or summary judgment.
21         I can tell you what I've told you before.  I've told you,
22     number one, they have a contractual right, and they have a
23     contractual right at a minimum on an equal basis with everyone
24     else if the loan is being paid 100 percent for all due amounts.
25         If it's being paid less, they have a fiduciary obligation
```

1    especially if they're proposing to the direct lenders anything

2    less than 100 percent of their principal.

3        It gets a little more gray when they are saying 100

4    percent of your principal and X percent of your accrued

5    interest, and we get X percent of our accrued default interest.

6    It's gets a little more gray.

7        But without hearing the facts which, of course, precludes

8    summary judgment -- we really have to hear the facts at trial.

9    Short of hearing the facts, there's no way I can say in these

10    particular negotiations with this particular borrower you've

11    breached your fiduciary duties.  I can't say that.

12            MS. CHUBB:  I understand that you can't do that.  But

13    the way this settlement -- I think it's a proposal --

14            THE COURT:  Right.

15            MS. CHUBB:  -- is formatted --

16            THE COURT:  I agree.

17            MS. CHUBB:  -- it's not fair.

18            THE COURT:  I agree.

19            MS. CHUBB:  So we need to at least go back and do it

20    some other way --

21            THE COURT:  Uh-huh.

22            MS. CHUBB:  -- and figure out how to do that.

23        (Colloquy not on the record.)

24            THE COURT:  I agree, but do you see why my ruling

25    might well say I'm not going to delete the alternative of a

```
 1    settlement as long as --

 2            MS. CHUBB:  Well --

 3            THE COURT:  -- it's properly supported and/or even an

 4    opt-out?  Of course, I'll give the ruling, the reasons and

 5    rationale, for including no opt-out if that's appropriate.

 6            MS. CHUBB:  I understand, and I'm not asking you to

 7    throw out --

 8            THE COURT:  Settlement --

 9            MS. CHUBB:  -- the idea --

10            THE COURT:  -- as --

11            MS. CHUBB:  -- of settlement.

12            THE COURT:  -- an alternative.

13            MS. CHUBB:  I'm asking you not to approve this

14    settlement as it's been presented to you.

15            THE COURT:  And I agree with that.

16            MS. CHUBB:  Thank you.

17            THE COURT:  Okay.

18        (Colloquy not on the record.)

19            THE COURT:  Please.

20            MS. SHUMENER:  May I?

21            THE COURT:  Um-h'm.

22        (Colloquy not on the record.)

23            THE COURT:  Good afternoon.

24            MS. SHUMENER:  First, I want to thank you for

25    accepting my pro hac vice application, your Honor --
```

```
 1            THE COURT:  Yes.  Please.

 2       (Colloquy not on the record.)

 3            MS. SHUMENER:  -- and to say that I wish I had gone

 4  first because going last it's a little tough to follow all of

 5  these, but the one thing that keeps ringing through my ears is

 6  that neither the lenders nor the Court have enough information

 7  before them to make a reasonable decision about what would and

 8  would not be fair.

 9            And before that can be done, someone needs to do a report.

10  I was going to say the receiver, but I don't want to burden

11  people.

12            But a report needs to be done on loan-by-loan basis as to

13  what the loan documents say and what the loan-servicing

14  agreements say, so that we could at least see just no -- I

15  don't think anyone, not the direct lenders --

16            THE COURT:  On the XYZ loan, there is a --

17            MS. SHUMENER:  Absolutely.

18            THE COURT:  -- total right by the servicer to apply

19  first any proceeds for default interest.  On the ABC loan,

20  there is no right.

21            MS. SHUMENER:  Right.

22            THE COURT:  It's up to the lenders.

23            MS. SHUMENER:  That's right.

24            THE COURT:  And, of course, the servicer being only a

25  partial interest of direct-lender interests --
```

1          (Colloquy not on the record.)

2          THE COURT:  -- or a zero holder of direct-lender

3     interests, they are not the lender.

4          MS. SHUMENER:  Right.  And they're tier 1.

5          THE COURT:  Um-h'm.

6          MS. SHUMENER:  And tier 2 should be to look at the

7     loan-servicing agreements --

8          (Colloquy not on the record.)

9          MS. SHUMENER:  -- because even in reading some of the

10    objections and things that have been submitted to the Court for

11    this hearing there are some loan-servicing agreements that say

12    late charges will be paid.  Others say late charges and default

13    interest will be paid.  Others say none of the above.

14         THE COURT:  Uh-huh.

15         MS. SHUMENER:  And some don't even have

16    loan-servicing agreements, so a two-tier analysis on

17    loan-by-loan basis needs to be made before anything else

18    happens.

19         To the extent possible, we also need to get some sort of

20    an analysis of what the lenders' claims are against Compass.

21    It isn't all right to say we'll just lump these together and

22    say, ah, 6,000,000 seems okay.

23         THE COURT:  Um-h'm.  Any such report, you cannot

24    expect to detail with any finality the ruling of the Court.

25    All you could expect from the report is that here's Compass'

```
1    position.  They're entitled to fees in the case of this
2    particular note.  Here's the receiver's position and the LLCs'
3    position.
4              MS. SHUMENER:  Right.
5              THE COURT:  They're not.
6              MS. SHUMENER:  Or the direct lenders' position,
7    but --
8              THE COURT:  And we assess --
9              MS. SHUMENER:  Yeah.
10             THE COURT:  -- there's a 50-percent chance of the
11   receiver succeeding, and so a discount of 40 percent or
12   60 percent is reasonable or not reasonable.
13             MS. SHUMENER:  And I would recommend to the Court
14   with all due respect, really, that such a report be circulated
15   to the lenders, input be gotten from the lenders, the report
16   submitted to the Court before even class certification is
17   considered, so that you can see do we have individuals who are
18   ready to step up and be class representatives for some of these
19   subclasses, so that there is a basis on which to certify a
20   class.
21        And maybe the settlement needn't by a global settlement.
22   Maybe it's a settlement that has to be done on loan-by-loan
23   basis.  It --
24        (Colloquy not on the record.)
25             MS. SHUMENER:  Certainly, I've heard one of the
```

1    proposals today was, well, we'll kind of allocate them across

2    the loans but pro rata by the value of the properties.

3        Well, so if one loan has a valuable property, and another

4    loan has an invaluable property or a lesser-valuable property,

5    some people's retirement accounts are being used to pay

6    disproportionate amount of the sum --

7        THE COURT:  Now, that argument I don't understand

8    because the receiver is the class representative either for a

9    general broad class or for subclasses.

10       MS. SHUMENER:  The receiver hasn't got the standing

11   to be a representative of either the general class or the

12   subclass because the receiver --

13       THE COURT:  That's simply --

14       MS. SHUMENER:  -- has no interest in a loan.

15       THE COURT:  -- an argument to dismiss this lawsuit

16   altogether filed on behalf of LLCs.  That's all that is.

17       I wouldn't be dismissing Compass' lawsuit to seek

18   injunctive relief and/or damages for interference with their

19   rights, but that argument just simply results in a dismissal of

20   the LLCs' cause of action for termination.

21       MS. SHUMENER:  Until the receiver can find individual

22   lenders to service class representatives of the subclass, I

23   don't think that the Court can take a party against his, her,

24   or its will and say I'm putting you in a receivership, so that

25   now we have a representative that the receiver stands in the

1   shoes of to form a class, and --

2           THE COURT:  Well --

3           MS. SHUMENER:  And I'm --

4           THE COURT:  -- why --

5           MS. SHUMENER:  What I'm suggesting --

6           THE COURT:  -- not?

7           MS. SHUMENER:  Why not?  Because --

8           THE COURT:  I've already --

9           MS. SHUMENER:  -- the first --

10          THE COURT:  -- done that.  Has anybody appealed it?

11          MS. SHUMENER:  Well, you've done that with LLCs --

12          THE COURT:  Right.

13          MS. SHUMENER:  -- that have no interest in the loans.

14          THE COURT:  Because they were committing fraud upon

15  the investors --

16          MS. SHUMENER:  Correct.

17          THE COURT:  -- and because they did not have standing

18  because of that fraud.  I told them.  I forewarned them.  You

19  have you to resolicit your power of attorney let alone your

20  interests.

21          MS. SHUMENER:  Um-h'm.

22          THE COURT:  They ignored my requirement, so, finally,

23  I had to do --

24          MS. SHUMENER:  Right.

25          THE COURT:  -- the only thing that was left to me.

```
 1                MS. SHUMENER:  Um-h'm.

 2                THE COURT:  And that is you're out of the case.  I'm

 3   appointing a receiver.

 4                MS. SHUMENER:  Understood, your Honor, but the direct

 5   lenders didn't --

 6                THE COURT:  Nobody's appealed it.

 7                MS. SHUMENER:  But the direct lenders did not commit

 8   fraud, and so say to a direct lender against --

 9                THE COURT:  The direct lenders?  No.

10                MS. SHUMENER:  No.

11        (Colloquy not on the record.)

12                MS. SHUMENER:  I know.  I --

13                THE COURT:  Ms. Cangelosi in solicitation of the LLC

14   interests committed securities fraud.

15                MS. SHUMENER:  I have no dealings with Ms. Cangelosi.

16                THE COURT:  I understand.

17                MS. SHUMENER:  I've never met her or any of that.

18                THE COURT:  I do.

19                MS. SHUMENER:  All I'm speaking for --

20                THE COURT:  I have ruled --

21                MS. SHUMENER:  -- is --

22                THE COURT:  -- as such.

23                MS. SHUMENER:  I understand, but what I'm saying is

24   the class that is being formed now --

25                THE COURT:  Uh-huh.
```

1      MS. SHUMENER:  -- or subclasses as being proposed

2  prematurely I might add because we need to see that report, but

3  that has to have individual lenders who are willing to step up

4  and be the representatives of the class, and then if they

5  volunteer to have the receiver act for them that's okay.

6      THE COURT:  As opposed --

7      MS. SHUMENER:  But these are victims.

8      THE COURT:  -- to the LLCs?

9      MS. SHUMENER:  As opposed -- the LLCs have no

10  interest in the loans.  The LLCs can't represent the class.

11  The LLCs --

12      THE COURT:  Uh-huh.

13      MS. SHUMENER:  The LLCs have no standing.  The LLCs

14  are empty vessels.  They have now --

15      (Colloquy not on the record.)

16      MS. SHUMENER:  They have not --

17      THE COURT:  But, really --

18      MS. SHUMENER:  They don't have any --

19      (Colloquy not on the record.)

20      THE COURT:  -- that's just an argument to dismiss the

21  lawsuit altogether on behalf of the LLCs.

22      MS. SHUMENER:  I'm actually --

23      (Colloquy not on the record.)

24      MS. SHUMENER:  I think, probably, that class actions

25  should be brought.  As the posture of the case is procedural

```
 1    now, it may be that a dismissal's the only outcome as to the

 2    procedurally-proper mechanism.

 3              THE COURT:  It would be --

 4              MS. SHUMENER:  I'm not --

 5              THE COURT:  -- a great way for me to duck the issue.

 6              MS. SHUMENER:  Yeah.

 7              THE COURT:  We'll just send it --

 8         (Colloquy not on the record.)

 9              THE COURT:  -- to another Court.

10         MS. SHUMENER:  Well, if there are individual lenders

11    who are prepared to step up and be class representatives and

12    want the receiver to bring an action for them, that's one

13    thing.

14         (Colloquy not on the record.)

15         MS. SHUMENER:  But the LLCs are not lenders, and they

16    have no interest in the loans or in the outcome, and, frankly,

17    it's not --

18         (Colloquy not on the record.)

19              MS. SHUMENER:  So that's what I'm saying.  I think --

20              THE COURT:  Again, a general question.  Is anybody

21    aware of any appellate notice or request to my appointment of a

22    receiver for the LLCs?

23              UNIDENTIFIED SPEAKER:  No, your Honor.

24              THE COURT:  Any?

25              MS. SHUMENER:  No.
```

1              THE COURT:  Okay.

2              MS. SHUMENER:  Not that I'm aware of.

3              THE COURT:  So in my mind, that's final.

4              MS. SHUMENER:  Well, your appointment of a receiver

5      for the LLCs is most certainly final.

6          (Colloquy not on the record.)

7              MS. SHUMENER:  But whether the LLCs or the receiver

8      who stands in their shoes --

9              THE COURT:  Um-h'm.

10             MS. SHUMENER:  -- has standing to be a class

11     representative --

12             THE COURT:  Don't I determine --

13             MS. SHUMENER:  -- is the issue --

14             THE COURT:  -- the standing issue at the inception of

15     the lawsuit?

16         (Colloquy not on the record.)

17             MS. SHUMENER:  No.  You can determine standing at any

18     time during the lawsuit, your Honor.  And if they no longer --

19         (Colloquy not on the record.)

20             THE COURT:  Well, that's a mootness question, of

21     course.

22         (Colloquy not on the record.)

23             THE COURT:  But don't I determine standing at the

24     inception of the lawsuit according to Ninth Circuit authority?

25             MS. SHUMENER:  No.  That's not my understanding.

```
 1              THE COURT:  No.  I determine it constantly throughout
 2      the case.
 3              MS. SHUMENER:  You can determine it -- the issue of
 4      standing can be raised at any time during a case.  And if there
 5      is lack of standing --
 6              THE COURT:  But I determine it as of the inception of
 7      the case, don't I?
 8              MS. SHUMENER:  Not necessarily.
 9              THE COURT:  No.
10              MS. SHUMENER:  I --
11              THE COURT:  I --
12              MS. SHUMENER:  I don't know.  I don't know the answer
13      to that question, your Honor.  I don't want to --
14              THE COURT:  I think I do.
15              MS. SHUMENER:  Okay.  Well --
16              THE COURT:  Uh-huh.  Okay.
17              MS. SHUMENER:  Well, thank you.
18              THE COURT:  All right.
19          (Colloquy not on the record.)
20              THE COURT:  Other objections or comments?
21              MR. MOORE:  Your Honor, if the Court would indulge me
22      for one second -- and I certainly will allow Mr. Mainland and
23      Mr. Coffing to address the issue of the receiver's standing.
24      That's not --
25              THE COURT:  Did I get everybody else's objection?
```

1          (Colloquy not on the record.)

2              THE COURT:  Okay.  All right.  Go ahead.

3              MR. MOORE:  As I understand and have heard the

4     Court's comments over the course of this morning and this

5     afternoon, I'd like to put it into the context of how we dealt

6     with this in negotiation because we did think about I think the

7     issues you're raising.

8          (Colloquy not on the record.)

9              MR. MOORE:  And Compass came to the negotiation --

10    this is obviously an extraordinary complex situation, and

11    Compass came to the negotiation trying to quickly get to a

12    result that would enable Compass to leave the scene, allow a

13    new servicer to come in with a structure that was very stable,

14    and, therefore, on advantageous economic terms, and move

15    forward.

16         The receiver's view was that the issue of how the

17    settlement fund is allocated is something that would be the

18    subject of a separate and subsequent report to the Court.  And,

19    in essence, that allocation I think is what's troubling the

20    Court.

21         I mean, there's been some talk here about subclasses.

22    There's been some talk about note-by-note issues --

23             THE COURT:  But isn't it a good argument that there's

24    no way for the Court to determine the equitable nature of the

25    fairness of the settlement without some information to the

```
 1    investors in each note as to how --

 2              MR. MOORE:  Absolutely.

 3              THE COURT:  -- allocation occurs --

 4              MR. MOORE:  Absolutely, and that's --

 5              THE COURT:  -- and, more importantly, on what basis?

 6              MR. MOORE:  Yeah.  And absolutely, and that was in my

 7    comments earlier.  I was trying to say that I think the

 8    receiver is going to have to make a full-disclosure-statement

 9    type statement as to how the receiver arrived at these numbers,

10    how the receiver intends to allocate.

11        And at the fairness hearing which is the final approval

12    hearing, that's the point in time in which the objections

13    you're hearing can be raised in the context of something

14    proposed, and the Court can answer because what I'm worried

15    about --

16              THE COURT:  You're just asking me here today to

17    conditionally certify a class.

18              MR. MOORE:  It's just a preliminary approval.  And if

19    we wait to go negotiate that, bring it back -- you know,

20    Ms. Chubb talked about a summary judgment.  That won't work.

21    We could come in with a proposal.

22        But the problem is every day that Compass stays in place

23    it accrues servicing fees.  And every day it stays in place,

24    there seems to be an attitude among the lenders that they are

25    simply not going to approve any loan resolution while Compass
```

1    is there.

2        We are trying to address both of those concerns --

3            THE COURT:  Right.

4            MR. MOORE:  -- by moving the process along.

5            THE COURT:  Okay.

6            MR. MOORE:  Frankly, we were surprised --

7            THE COURT:  I think --

8            MR. MOORE:  -- we had to wait --

9            THE COURT:  -- I have enough.

10           MR. MOORE:  -- 90 days.

11           THE COURT:  I'm ready to rule.  I'm going to rule.

12           UNIDENTIFIED SPEAKER:  May I speak --

13           THE COURT:  I'm not going to --

14           UNIDENTIFIED SPEAKER:  -- your Honor?

15           THE COURT:  No, ma'am.

16       I'm not going to approve the settlement at this point, but

17   I'm going to make it clear in the ruling that I can give

18   conditional approval of a settlement, a conditional

19   certification, really, probably to a proposal that includes

20   subclasses.

21       First, let me rule that I overrule the objection to no

22   opt-out provision.  This is a lawsuit that primarily seeks

23   declaratory relief.

24       On behalf of the direct lenders and the LLCs who filed

25   suit, it sought a declaration of termination of the rights of

1    Compass and, incidentally, only damages caused by Compass in

2    breach of duty.

3        On behalf of Compass, it sought declaratory relief.  We

4    have the right, of course, to collect, but, more importantly,

5    they sought injunctive relief and damages, incidentally, to

6    those who had interfered with the rights declared transferred

7    by the bankruptcy court in a final confirmation order.  It was

8    primarily declaratory relief.

9        The declaration sought even in the proposed settlement is

10    primarily for equitable relief.  Compass has the right to

11    collect X fees.  It does not have the right to collect other

12    fees, and the settlement settles that legal issue.

13        It provides for payment no doubt one way or the other,

14    both the tort fund and advances and servicing fees that are not

15    contested, but, also, resolves on some kind of a

16    discounted-settlement basis a request also for other fees.

17        So it is primarily I would rule a declaratory/injunctive/

18    equitable-relief kind of case on both sides with incidental

19    consequent award of payments one way or the other consistent

20    with the declaration.

21        So I'm going to overrule the objection that there can be

22    no opt out.  I think it is appropriately in this case due to

23    the complexity of the case, due to the background, due to the

24    other factors.  It fits within the guidelines of Rule 23 for

25    those classes that may prohibit an opt-out.

120

1          There's every reason in the world to so characterize

2     classes in this case because there is no appropriate efficient

3     effect for opting out.

4          If there's a settlement or a resolution on a class basis,

5     those who opt out, what do they get?  They get no enjoyment nor

6     can they enjoy any declaration of the Court that there is a

7     termination or no termination.  That Compass is entitled to X

8     fees or no X fees.  They don't share in that participation.

9          They have to take it to another Court to have that other

10    Court determine their own rights.  And if they're a minority

11    interest, what does it allude them?  What does it benefit them?

12         They've got one Court that said there is every right of

13    Compass to continue to serve or no right to serve.  What does

14    it benefit them to go to another Court to seek the same

15    declaration?  There's just no benefit.

16         The only benefit of opting out is with respect to either

17    a declared-after-trial amount that's due on a particular

18    note --

19         (Colloquy not on the record.)

20              THE COURT:  -- or an allocation or assessment of fees

21    or advances due to Compass.  It's the only thing that benefits

22    them by an opt-out.

23         This case primarily involves equitable relief note by note

24    to be sure, but that's the primary relief requested, so an

25    opt-out serves no proper function.

121

1          It is important to consider the voice of the putative

2     class members at the outset before we even start down the road

3     of approving a settlement, no doubt about that, because they

4     are the main parties who are represented in the class.

5          Therefore, I am admitting these exhibits that I have

6     received, the letters, and the input.  I have written input

7     from various of the direct lenders.  I've considered it.

8          It's the primary reason why I'm adopting this ruling today

9     in not approving on a conditional basis either the

10    certification of the class or the settlement.  I've heard those

11    voices.  And, of course, the receiver should and counsel for

12    the receiver as well.

13         Going a little bit further, I don't think I can

14    conditionally certify this class overall.  I'm not saying I

15    could never, but I need more support.

16         What I really need is an analysis note by note.  This

17    note, ABC note, has been paid.  There's basically agreement on

18    this one.

19         They're entitled to no fees or they're entitled to all of

20    the fees that have been reserved or they're entitled to X

21    dollars of fees.

22         There's basically agreement on this one, and, therefore,

23    any proposed settlement ought to hone to that understanding

24    relative to the ABC note.

25         On the XYZ note, it's a different case and, therefore,

1    potentially needs a different class because the facts and law

2    may be very different.

3         On this note, there are egregious facts that would be

4    presented at trial versus Compass.  There's stronger facts

5    vis-a-vis a breach of fiduciary duties.

6         There's a much lower presentation to the direct lenders of

7    a percentage of principal that would be paid to them while

8    Compass reserves the right to 100 percent of their fees.

9         And, therefore, there's an assessment by counsel that

10   there's a very strongly likelihood of the receiver prevailing

11   whether a class action or a direct action.

12        And there's a need for a greater discount by Compass with

13   respect to a settlement on that note.  Another note may be

14   different.

15        So what I'm saying is there does need to be an assessment

16   of note by note and then come back to tell me, look, all of the

17   facts are pretty similar other than the notes that have already

18   been collected.

19        Here's our analysis note by note, and, guess what, it

20   results in one single class.  The facts and law are pretty

21   common, and, therefore, we are presenting, Judge, still a

22   single class.

23        On the other hand your analysis may say, you know what,

24   there really needs to be a class for every note or, more

25   likely, in my mind several classes that represent several of

123

1    the notes in similar or same factual and legal scenarios.

2        So you've got three notes in which they've already been

3    paid, and there's not much disagreement about what they're

4    entitled to.  In fact, moneys have already been paid the direct

5    lenders.  That's in class A.

6        (Colloquy not on the record.)

7            THE COURT:  We're not going to allocate any of this

8    big chunk to class A because it's already been resolved, and

9    they've already worked it out.

10       Class B, on the other hand, is a very seriously-disputed

11   group.  We have egregious facts.

12       So I'm not dictating to you, but my thought is that the

13   likely scenario is not subclasses for every note, but several

14   different subclasses where the law and the facts are very

15   similar or identical with respect to those various notes.

16       The analysis needs to be on note by note based upon the

17   language of the note and note by note taking into consideration

18   what one counsel here has argued is already res judicata.  That

19   is the servicing fees that the direct lenders in that note are

20   entitled or obligated to give to any servicer.

21       I do think you do need to make the two-level assessment,

22   but the analysis needs to be note by note and then accumulated

23   for one single class if that's your resolution or note by note

24   or several different subclasses if that's the resolution.

25       And then I think I need to order you to -- the things that

1    are dissatisfactory to me -- and I've already addressed

2    certification of a class.

3        I could certify a class or classes if there was proper

4    support that the receiver representing the LLCs appropriately

5    represents the members of the class.

6        I'm not expressing any dissatisfaction with the overall

7    amount of the settlement.  I just simply don't have enough to

8    tell me whether it was reasonable or not.

9        I hear this 40-percent discount figure, but I have no way

10   of knowing.  Out of 167,000,000, maybe after your analysis

11   you're going to see that, really, they're only entitled to

12   50,000,000 best case for them, and, therefore, a 40-percent

13   discount of 50,000,000 is very different from a discount from

14   167,000,000.

15       So I just don't have enough to tell me whether I can

16   certify a class or whether the settlement is anywhere near

17   reasonable without that note-by-note analysis.

18       The 18-percent figure doesn't make any sense to me,

19   either, relative to a fair-market rate of interest.  It does on

20   the 15,000,000.  Let's see.  There were two categories of

21   15,000,000.  One was the money advances already paid.

22       The advances already paid along with a settlement that

23   proposes termination of Compass makes a lot of sense to me.

24   There's no reason why Compass should settle and walk away on an

25   if-come (phonetic) on repayment of their advances out of

125

1    pocket.

2        I've already broadly broadcast to you that they're going

3    to get every penny of their fairly-issued advances and

4    depending on what the note I suppose with interest, maybe not.

5    That depends on what the notes and/or servicing agreements say.

6        They're going to get every penny of that, and I see no

7    reason why they shouldn't get that immediately or with a very

8    substantial interest rate if it's not forthcoming.

9        The other, of course, is a little more tentative.  That

10   they're really only entitled to a future 15-percent and then

11   that analysis based upon $15,000,000 relative to future

12   collections.

13       That I'm not sure why I see that there needs to be an

14   immediate payment for that or even an 18-percent interest rate

15   if they're not paid immediately.  I'm not sure I understand the

16   rationale for that.

17       Under the notes, under the obligations as they now stand,

18   they only get that when it's collected, and there's no interest

19   due on future collection fees that are collected when and if

20   the borrower pays them.

21       There's no interest due back to some prior date, so I'm

22   not sure why they would get a representation of immediate

23   payment or interest if there can't be an immediate payment.

24       On the amount of the settlement, I simply have no way to

25   opine, and, therefore, I'm simply going to order that you do

126

1    the analysis for an amended complaint.  I'm certainly going to

2    approve the filing of an amended complaint, class-action

3    complaint, with subclasses.

4        But the amount, I simply have no basis to opine, and,

5    therefore, I'm just going to simply order that both sides

6    submit to a further mediation once you've done the analysis.

7        If the receiver walks into the mediation and, thereafter,

8    into this court and says, Judge, we're not interested in

9    further mediation, after doing the analysis, it looks like

10   we've got a super deal, and we're going to present that

11   original deal if Compass is still willing to proceed, then

12   support it and present it to me and go forward.

13       If on the other hand after the analysis you see we need to

14   ask for further concessions by Compass because, look, it's only

15   50,000,000 they're entitled to, not 167,000,000, then, of

16   course, you'll do that.

17       I'm just simply going to order that each side commit to at

18   least one further day if not several days of mediation once you

19   do the analysis appropriate and, of course, forthwith file the

20   amended complaint if you're able to do that.

21       I see there's no way for me to make an assessment on the

22   tort-fund allegation and amount.  I have ruled on the opt-out

23   and overruled that objection, and I've given you the reason for

24   denying, presently, conditional certification only of an

25   overall class.

1    I just haven't had the support.  I'm not outlawing an

2    overall class, but I'm saying I don't have the note-by-note

3    analysis that's got to occur in order to have one single class

4    or to support an amended complaint that lists subclasses, so

5    that's what I need.

6        This is a major imposition upon Jaworski.  I don't know

7    that I can.  I'll leave it to them to tell me that they want

8    out still.

9        I am tentatively asking them to remain in the case long

10   enough to get one further mediation concluded and an attempt at

11   one further certification of classes and settlement.

12       I'm also overruling the objection on lack of standing of

13   the LLC or representative-class standing.  I'm determining that

14   status.  I hear the objection.  I'm the one who ordered halfway

15   through the lawsuit that the LLCs turn back the interests.

16       As far as I'm concerned at the inception of the lawsuit,

17   the LLCs had standing, and, therefore, I'm overruling that

18   objection.  They had standing at the inception.

19       And only as a result of the equitable relief that the

20   Court mandated by the return of those interests and the

21   appointment of a receiver did I change the circumstances,

22   nobody else, and, therefore, there was standing at the

23   inception of the case, and there is standing still.

24       So those are the express rulings on the record.  It

25   contains my findings and conclusions as are permitted under the

1    Federal Rules of Civil Procedure.

2        And I'll solicit an order that very simply denies

3    conditional certification at this time, but allows an amended

4    complaint for a class action and orders a return to mediation

5    upon completion of an appropriate analysis.

6        (Colloquy not on the record.)

7            MR. JUDD:  Your Honor, may I?

8            MR. KIRBY:  Your Honor, I have one question.

9            THE COURT:  Sure.

10           MR. KIRBY:  Your Honor directed, quote, unquote,

11    "both sides to mediate."  The parties that have been

12    represented by counsel and filed papers and argued here today

13    would like to participate --

14           THE COURT:  Uh-huh.

15           MR. KIRBY:  -- in that mediation.

16           THE COURT:  I don't think I barred them.  I did say

17    that Cangelosi could not participate.  I definitely said the

18    LLCs as represented by the receiver may participate.

19        Of course, the other parties that have filed pleadings are

20    not parties.  You're only parties if I certify the class, then

21    you are parties.  You are definitely parties to a class action

22    especially if I don't let you opt out, and I --

23        (Colloquy not on the record.)

24           THE COURT:  I have not prohibited you from

25    participating in negotiations.  In fact, Ms. Cangelosi asked,

1    all right, well, can I at least sit in.  I said, of course, you

2    can sit in.

3        You just can't represent anybody else, and you can sit in

4    and listen, and I think in the prior hearings I made that clear

5    that direct lenders can sit in and listen.

6        (Colloquy not on the record.)

7        THE COURT:  You're not parties, unfortunately, but

8    I'm sure Judge Nakagawa will be interested in hearing your

9    position relative to a potential settlement between the

10    receiver representative of the class and Compass.

11        (Colloquy not on the record.)

12        THE COURT:  So without ruling, my advice to

13    Judge Nakagawa is, certainly, to listen to you because,

14    otherwise, next time, we'll get the same thing, so --

15        MR. KIRBY:  Thank you, your Honor.

16        THE COURT:  Uh-huh.

17        MR. JUDD:  That was simply mine if we can be a part

18    of that.  If we're not part of this lawsuit, but we're going to

19    be brought --

20        THE COURT:  Right.

21        MR. JUDD:  -- into the lawsuit afterwards --

22        THE COURT:  Again --

23        MR. JUDD:  -- I want to make sure --

24        THE COURT:  -- I can't rule that --

25        MR. JUDD:  -- that that's still (indiscernible).

```
 1              THE COURT:  -- because you're not a party, yet, but
 2      it's a mediation between a potential class representative, but
 3      my advice to Judge Nakagawa is to listen to what you have to
 4      say.
 5              MR. JUDD:  Thank you.
 6              THE COURT:  And, of course, a mediator --
 7              MR. JUDD:  That's good.
 8              THE COURT:  -- just simply listens to what you have
 9      to say to the other side, so that's what the mediator does.
10              MR. COFFING:  Your Honor, Terry Coffing on behalf of
11      the receiver.  A couple of practical matters --
12              THE COURT:  Please.
13              MR. COFFING:  -- that I'd like to address.  I think
14      what I hear you saying is that you want the receiver and I
15      guess in conjunction with Compass and try to do a loan-by-loan
16      analysis not only the effect of the various promissory notes --
17              THE COURT:  Right.
18              MR. COFFING:  -- on the distribution of any
19      resolution of a loan.
20              THE COURT:  Of trying to analyze whether note by
21      note --
22              MR. COFFING:  Okay.
23              THE COURT:  -- there is a right of termination in the
24      direct lenders, the members of the class, if I force a class
25      resolution for all members of that class.  Is there --
```

```
 1              (Colloquy not on the record.)

 2              THE COURT:  Are there grounds in the case of that

 3    note for termination.  And, number two, whether or not there's

 4    a right for termination, is there a right.  Do --

 5              (Colloquy not on the record.)

 6              THE COURT:  How strong is our position that Compass'

 7    right to servicing fees will be subordinated or will be

 8    prioritized in any resolution short of a 100-percent payoff.

 9              MR. COFFING:  Okay.  Our analysis at least thus far

10    indicates that there are six different types of promissory

11    notes.

12         The vast majority, I believe some 37 notes, are of one

13    type.  There's approximately 12 of another, and then there's

14    really only 1 or 2 in the other three remaining categories, so,

15    certainly, that analysis can be done rather quickly.

16         As to a note-by-note analysis as to whether or not there

17    are grounds to terminate Compass --

18              THE COURT:  That's obviously just an expression of

19    opinion --

20              MR. COFFING:  Okay.

21              THE COURT:  -- on your part.  You --

22              MR. COFFING:  Okay.

23              THE COURT:  You would state -- in that analysis,

24    you'd just simply say Compass' position is there's no right to

25    terminate.
```

132

1    In the receiver's, the receiver's position, of course, has

2    to be in litigation that there is.  Here's the three facts that

3    support the receiver's position.

4    And on behalf of the receiver as counsel for the receiver,

5    we estimate that there's a 50/50 chance, there's a 30-percent

6    chance, or we simply cannot provide an estimate --

7    (Colloquy not on the record.)

8    THE COURT:  -- of the chance of prevailing, and,

9    therefore, a settlement is reasonable or is not reasonable.  It

10   gives a 40-percent discount consistent with our estimate that

11   there's a 40-percent chance of losing or winning or we simply

12   can't give an estimate.

13   But the facts are very substantial, and it would require a

14   substantial amount of litigation to obtain that determination

15   from, finally, the appellate court.

16   MR. COFFING:  And I think I understand, your Honor.

17   You want our assessment as to their ability to litigate this

18   case, and Compass will obviously have their rebuttal.

19   My only concern from a litigation context is that there

20   may be facts in evidence that we'd be prepared to present that

21   we do not wish to at least at this time disclose to Compass --

22   THE COURT:  That's right.

23   MR. COFFING:  -- and I'm sure vice versa.

24   THE COURT:  That's right.

25   MR. COFFING:  And so we would have to be making some

1    recommendation somewhat in the blind.

2                THE COURT:  That's correct.  I can fully appreciate

3    that.  That's the problem every class representative has in

4    proposing a settlement.

5        When you go to the settlement-approval hearing, you can't

6    put all your cards on the table because you may have to

7    litigate.

8                MR. COFFING:  Right.

9                THE COURT:  The Court may not approve it.

10               MR. COFFING:  And, finally, at least from my

11   perspective, a practical concern is Judge Nakagawa was kind

12   enough on the third day.  He actually cut a vacation short to

13   come back and deal with us.  We greatly appreciate it.

14       But he also indicated strongly that he may not have

15   available dates in the near future, and so I didn't know what

16   the Court's time frame is because, obviously, I have the same

17   concern that Mr. Moore does and every direct lender here is

18   that every day servicing fees accrue --

19       (Colloquy not on the record.)

20               MR. COFFING:  -- until that termination.

21               THE COURT:  That's right.  You want to proceed as

22   quickly as you can, so you got to get the analysis done, so

23   that you can really assessment the settlement.  You got to do

24   that as fast as you can.

25       (Colloquy not on the record.)

1          THE COURT:  Forthwith, of course, you'll inquire of

2    Judge Nakagawa's chambers.  You may decide that, hey, all we

3    need, Judge, is ten minutes because we're going to come in and

4    say the settlement we got was terrific in light of the analysis

5    or you'll come back and say we really do need mediation time

6    because we have to ask Compass to make a further concession or

7    we have to offer Compass further compensation.

8        At any event, you'll --

9        (Colloquy not on the record.)

10         THE COURT:  You'll solicit Judge Nakagawa's time from

11   chambers.

12         MR. COFFING:  Okay.

13         THE COURT:  If you just absolutely can get no time

14   from him, then I'll try to provide someone else, either

15   Judge Russell who has some background with the case.  One of

16   our magistrate judges is impossible I'm sure, so I think that's

17   where we are.

18         MR. COFFING:  Your Honor, Mr. Mainland would like to

19   address the Fulbright position, then.

20         THE COURT:  Yes.  Please.

21       (Colloquy not on the record.)

22         THE COURT:  You're our fallback.

23         MR. MAINLAND:  Thank you.

24         THE COURT:  You're our ace in the hole.

25         MR. MAINLAND:  Thank you, your Honor.  I'm --

```
 1                THE COURT:  You're the one we look to litigate if --

 2                MR. MAINLAND:  I'm not trying to make your life even

 3       more complicated than it already is, your Honor, but I did want

 4       to go back to a point that Mr. Coffing raised at the outset.

 5            (Colloquy not on the record.)

 6                MR. MAINLAND:  Since the settlement and this motion

 7       was filed, our law firm did get a letter from one direct lender

 8       saying that he and some unidentified others planned to file a

 9       lawsuit against Fulbright & Jaworski.

10            And one of the things in the letter that he complains

11       about was Fulbright & Jaworski's involvement in the mediation

12       and this settlement.

13                THE COURT:  Well, it sounds like a claim based upon

14       conflict of interest and a violation of ethical standards.

15                MR. MAINLAND:  That --

16                THE COURT:  You do have a forum here.  You can submit

17       the question to this Court, do we have a conflict of interest,

18       so you do have a forum to forestall such a complaint, of

19       course.

20                MR. MAINLAND:  Okay.  Well, I appreciate that,

21       your Honor, and I was not aware of that availability of that

22       forum.

23                THE COURT:  Well, they could file a motion, for

24       example, to recuse you.

25            (Colloquy not on the record.)
```

1          THE COURT:  And I'm assuming that you have the

2    ability to precede that with a motion that confirms your

3    ability to represent the receiver --

4          MR. MAINLAND:  Okay.

5          THE COURT:  -- without a conflict of interest, Judge,

6    there's this question that's been presented under the ethical

7    standards, and do we have a conflict.  We don't believe we do.

8    Here's the reasons, and we notice it for anybody who wants to

9    oppose it.

10        But it seeks a -- since the receiver has sought authority

11   from this Court to appoint you, I'm sure I have the

12   jurisdiction to consider whether or not you have to recuse or

13   not.

14        (Colloquy not on the record.)

15        MR. MAINLAND:  Okay.  And thank you very much for

16   that help, your Honor.  And just for the record, I want to

17   state we, of course, believe that there's no basis for a claim

18   against the law firm, but I just wanted to state that --

19        THE COURT:  Right.

20        MR. MAINLAND:  -- for the record.

21        THE COURT:  Okay.

22        MR. MAINLAND:  Thank you, your Honor.

23        MR. LANGBERG:  Your Honor, may I --

24        THE COURT:  You're our best hope for litigating, and

25   that's the main hammer that we have to oppose Compass is if we

1    don't get a settlement or an approved settlement, then here's

2    Jaworski.  They're ready with a long history --

3        (Colloquy not on the record.)

4              THE COURT:  -- uh-oh --

5              MR. MAINLAND:  Let me just say this, your Honor.

6    If --

7              THE COURT:  -- to do --

8              MR. MAINLAND:  If --

9              THE COURT:  -- battle.

10             MR. MAINLAND:  If there is not ultimately going to be

11   a settlement, we --

12             THE COURT:  You do have --

13             MR. MAINLAND:  It --

14             THE COURT:  -- a --

15             MR. MAINLAND:  It --

16             THE COURT:  -- problem.

17             MR. MAINLAND:  It is our present intent to renew our

18   motion to withdraw, and we do understand Mr. Coffing is working

19   on replacement counsel if it comes to that, your Honor.

20             MR. LANGBERG:  May I ask two points by way of a

21   clarification --

22             THE COURT:  Please.

23             MR. LANGBERG:  -- for counsel table, your Honor?

24             THE COURT:  Uh-huh.

25             MR. LANGBERG:  First off, just with regard to the

138

1    inviability of an opt-out, I would just ask the Court to

2    consider the following:

3         That is on loan-by-loan basis, a decision of opting

4    out does not create the same problem that your Honor had

5    posed.

6         And it seems that classes that are going to be on a

7    loan-by-loan basis under agreements that allow for a majority

8    vote might allow a mechanism that addresses that issue.

9              THE COURT:  I just don't see that, and, respectfully,

10   I have to decline.

11             MR. LANGBERG:  I understand.

12             THE COURT:  For example, if the analysis says in a

13   particular note it's been paid, and there's no reason to

14   allocate any settlement to them, and it's supported by an

15   appropriate analysis, the only thing the settlement does is it

16   abates any claim against Compass by you those folks.  That's

17   all that it does.

18        And there's no reason not to let them have no opt-out.  As

19   far as I can tell in that circumstance, it's declaratory relief

20   that they're seeking.

21        What we collected we had a right to collect, and those

22   servicing fees are ours under the contract.  It's declaratory

23   relief, and I see no reason not to have an opt-out.

24        On the other hand, if the circumstances really are

25   different, and the receiver wants to roll it all up in one

139

1    class with other people in dissimilar cases, dissimilar notes,

2    you've got a forum.

3        You've got a forum at the initial stage of conditional

4    certification and at the final stage of approving a final

5    settlement to say that the class, proposed class

6    representative, doesn't represent us, number one.

7        And, number two, isn't it lumping us together with

8    similarly-situated class members, so you've got a forum to do

9    the opt-out.

10        And it seems to me that since it's declaratory relief

11    sought one side or the other that it's appropriate to include

12    that provision in a potential settlement.

13            MR. LANGBERG:  All right, your Honor.  Thank you for

14    that.

15        The second question is -- and this is not so hypothetical.

16    You've you mentioned loans where there is nothing left to do

17    but distribute funds that are escrowed, and --

18            THE COURT:  Or loans that have already been

19    distributed --

20            MR. LANGBERG:  Loans that have been -- true.

21            THE COURT:  -- other than the one percent, so --

22            MR. LANGBERG:  But there are loans, for example,

23    where there's nothing left to terminate because the loan itself

24    has been resolved, and disputed funds are escrowed.

25        And there, again, not so hypothetically it could be

1    51 percent if not all of the members of those loans who would

2    like to litigate that issue themselves through selective

3    counsel as opposed to be a member of a class that deals with

4    issues far beyond what they are dealing with.

5        And the question is is anything that we discuss here today

6    leave open the possibility that people who want to again as an

7    entire loan or the majority of an entire loan address their

8    issues directly that would allow them to I guess "pre-opt-out"

9    is really what the words are by filing an action here in the

10    name of the direct lenders and not subjecting themselves to a

11    negotiation process they don't want to participate in.

12        THE COURT:  Okay.

13        MS. SHUMENER:  I think I was going to follow up with

14    one thing -- I'm sorry.  I don't know your name, but my

15    colleague over here -- was saying.

16        And that is that in some instances on a loan-by-loan basis

17    you may find that 51 percent of the lenders don't want to

18    terminate Compass, but that's not their issue at all.

19        Their issue may just simply be damages, and so I think the

20    concern raised was a good one that I guess until we see the

21    report we won't know where all of that --

22        MR. MOORE:  Your Honor, if I might respond to that if

23    it's possible?  Again, Bob Moore of Milbank on behalf of

24    Compass.  We negotiated with the receiver through --

25        THE COURT:  I think I can guess at your response.

```
 1              MR. MOORE:  -- the mediation --

 2              THE COURT:  You're not interested in any

 3    settlement --

 4              MR. MOORE:  -- a global settlement.

 5              THE COURT:  -- if there's going to be 50 different

 6    lawsuits.

 7              MR. MOORE:  Exactly, your Honor.

 8              THE COURT:  Why should you?  You've got a forum here

 9    that can declare your rights and declare it with respect to the

10    note, generally.

11         Why should you opt into a settlement that allows 100

12    different direct lenders to sue in whatever court they want?

13    There's no reason for you to, so okay.  All right.  That's the

14    ruling.

15         Can I have a simple order that just makes reference --

16         (Colloquy not on the record.)

17              THE COURT:  -- to the findings and conclusions.

18         Thank you for your attention.

19         (Colloquy not on the record.)

20              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

21              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

22              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

23              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

24              MR. KIRBY:  Thank you, your Honor.

25              MS. SHUMENER:  Thank you, your Honor.
```

1          MS. DAKIN-GRIMM:  Thank you, your Honor.

2          MR. MOORE:  Thank you, your Honor.

3          THE CLERK:  All rise.

4     (Court concluded at 03:31:41 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I certify that the foregoing is a correct transcript

2   from the electronic sound recording of the proceedings in

3   the above-entitled matter.

4

5

6   /s/ Lisa L. Cline                          08/13/08

7   _____        _____
    Lisa L. Cline, Transcriptionist            Date

8

9

10  /s/ Michele Phelps                         08/13/08

11  _____        _____
    Michele Phelps, Transcriptionist           Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement") is entered into by and among: on the one hand, the Limited Liability Companies ("LLCs") formed with respect to each of the loans set forth in Exhibit "A" hereto ("Loans") that are Plaintiffs in the Second Amended Complaint for Declaratory Relief and Damages filed on February 7, 2008 (the "Complaint") in Case No. 3:07-cv-241-RCJ-GWF pending before the United States District Court for the District of Nevada ("District Court"), Tom R. Grimmett, as Receiver for the LLCs (the "Receiver"), and those persons and entities other than the LLCs that are named as Plaintiffs in the Complaint ("Non-LLC Plaintiffs," and together with the LLCs, "Plaintiffs"); and on the other hand, Compass USA SPE LLC, a Delaware Limited Liability Company ("Compass USA"), Compass Financial Partners LLC, a Delaware Limited Liability Company ("Compass FP, and together with its licensed subservicers and affiliates and Compass USA, "Compass") that are the Plaintiffs in the adversary proceeding formerly before the Bankruptcy Court, District of Nevada from which the reference was withdrawn by the United States District Court, District of Nevada (the "Adversary Proceeding") in Case No. 2:07-cv-892-RCJ-GWF-BASE, (together with Case No. 3:07-cv-241-RCJ-GWF, the "Cases"), Silar Advisors, LP, Silar Special Opportunities Fund, LP (together with Silar Advisors, LP, "Silar"), David Blatt, and Boris Piskun, each a Defendant in the Cases, and additionally as to Compass a Counterclaimant in the Counterclaims of Compass USA and Compass FP for Declaratory and Injunctive Relief and Damages filed in the Cases on December 14, 2007 (the "Cross-Complaint"), referred to collectively as "Defendants," and together with Plaintiffs and the Receiver, the "Parties"). Upon the Effective Date, as that term is defined below, the Settlement Agreement also shall be deemed to include and bind each Class Member, as that term is defined below.

## I.   DEFINITIONS

For purposes of this Settlement Agreement, the following terms shall have the meanings ascribed to them:

A. **"Adversary Proceeding"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

B. **"Cases"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

C. **"Class"** means the class consisting of all Direct Lenders, as defined below, which is alleged in the Class Action Complaint.

D. **"Class Action Complaint"** means the Third Amended Complaint to be filed in the Cases in the form attached as Exhibit "B" hereto upon issuance of an order from the District Court granting leave to file such Third Amended Complaint.

E. **"Class Member"** means all Direct Lenders.

F. **"Class Members' Released Claims"** means the claims described in Section II.F.(a) hereof.

G. **"Compass"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

H. **"Compass FP"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

I. **"Compass USA"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

J. **"Complaint"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

K. **"Confirmation Order"** means that certain Order entered by the United States Bankruptcy Court for the District of Nevada on January 8, 2007 confirming the Debtors' Third Amended Chapter 11 Plan of Reorganization in the jointly administered chapter 11 cases of USA Commercial Mortgage Company and its affiliated debtors (Case No. 06-10725-LBR) and authorizing the sale of substantially all of the assets of USA Commercial Mortgage Company and USA Capital First Trust Deed Fund, LLC to Compass Partners LLC pursuant to an Asset Purchase Agreement dated as of December 7, 2006.

L.    **"Cross-Complaint"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

M.    **"Defendants"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

N.    **"Defendants' Released Claims"** means the claims described in Section II.F.(b) hereof.

O.    **"Direct Lender"** means a Lender under, and holder of a mortgage or beneficial interest pursuant to security documents executed in connection with, a USA Commercial Mortgage Company "USACM" Loan, whether or not such holder presently is or ever was a member of a Plaintiff LLC, and regardless of when in time the holder acquired its beneficial interest, and each of their respective predecessors, successors and assigns.

P.    **"District Court"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

Q.    **"Effective Date"** means the date upon which the transactions described in this Settlement Agreement will close, and is the date by which the Order of the District Court entered in the Cases approving this Settlement Agreement and the Judgment and Order of the District Court entered in the Cases approving the class settlement sought in connection with the Class Action Complaint (such Order and Judgment and Order collectively, the "Judgment") either (i) is not the subject of a notice of appeal that has been filed on or prior to the date of expiration of the time for filing or noticing any such appeal, or (ii) is the subject of a notice of appeal that has been filed on or prior to the date of expiration of the time for filing or noticing any such appeal but no stay has been issued with respect to implementation and enforcement such Judgment.

R.    **"Final Settlement Hearing"** means the hearing to be conducted by the District Court to determine whether to finally approve and implement the terms of this Settlement Agreement and the class settlement sought in connection with the Class Action Complaint.

S.    **"LLCs"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

T.     **"LSA"** means a loan servicing agreement, whether written or implied by law, entered into between a Direct Lender and USACM for the servicing of a Loan.

U.     **"Loans"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

V.     **"New Servicer"** means a loan servicer designated by the Receiver who will replace Compass FP (together with its licensed sub-servicers) as servicer of the Loans pursuant to the terms of this Settlement Agreement.

W.     **"Non-LLC Plaintiffs"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

X.     **"Notice of the Settlement and Opportunity to Object"** means the notice to Class Members described in Section II.I hereof.

Y.     **"1% Assessment"** has the meaning ascribed to it in Section II.H. of this Settlement Agreement.

Z.     **"Parties"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

AA.     **"Plaintiffs"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

BB.     **"Plan"** means the Debtors' Third Amended Chapter 11 Plan of Reorganization confirmed by the United States Bankruptcy Court for the District of Nevada on January 8, 2007 in the jointly administered chapter 11 cases of USA Commercial Mortgage Company and its affiliated debtors (Case No. 06-10725-LBR).

CC.     **"Receiver"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

DD.     **"Settlement Agreement"** has the meaning ascribed to it in the introductory paragraph of this Settlement Agreement.

EE.     **"Silar"** means Silar Advisors, LP, a Delaware limited partnership, and Silar Special Opportunities Fund, LP, a Delaware limited partnership.

FF.    **"USACM"** means USA Commercial Mortgage Company.

GG.    **"Waterfall Resolution"** has the meaning ascribed to it in Section II.C. of this Settlement Agreement.

II.    **SETTLEMENT TERMS**

Subject to all of the terms and conditions described herein, the Parties agree as follows:

A.    **Replacement of Compass as Loan Servicer**

Compass FP, as assignee under the Confirmation Order of the rights of USACM as servicer with respect to the Loans and under all LSAs with Direct Lenders, voluntarily consents, as of the Effective Date, to the cessation of its rights as servicer of the Loans and to the assignment to a New Servicer, to be selected by the Receiver and engaged on terms to be negotiated by the Receiver, which may vary from those set forth in the LSAs, of such right under all LSAs, on the Effective Date.  Any and all fees the Receiver agrees to pay to the New Servicer shall be subordinated to the amounts to be paid to Compass under Section II.B. of this Agreement.  Compass will cooperate with and assist the Receiver and the New Servicer in the transition of the loan servicing duties to the New Servicer, including the delivery to the New Servicer of the files and records maintained by Compass and any sub-servicer or affiliate relating to the servicing of the Loans.  Compass shall also make available to the New Servicer and the Receiver its most knowledgeable person on each serviced loan for email and telephonic communication, for a period of thirty (30) days after the Effective Date.

B.    **Accrued Fees and Advances**

(1)  All servicing fees, expressed as an annual percentage assessed monthly under the terms of the LSAs with respect to all Direct Lenders, as accrued through and as of the Effective Date, and all amounts incurred through and as of the Effective Date by Compass as servicer advances on behalf of the Direct Lenders in accordance with the applicable LSAs, plus interest accrued on servicer advances from the date of payment by Compass until the date of re-payment to Compass, at a rate equal to the actual cost of capital to Compass (14% per annum), will be paid in full in cash on the Effective Date, as set forth in the following sentences of this

Agreement. Amounts shall be deemed reimbursable servicer advances under the prior sentence if Compass has done any of the following: (a) paid invoices to third party vendors with respect to servicer advances on behalf of the Direct Lenders in accordance with the applicable LSAs ("Paid Advances"); (b) received an invoice from a third party vendor with respect to such advances, but not paid such invoice as of the Effective Date ("Unpaid Advances"); or, (c) has work in progress or an unpaid obligation to a third party vendor with respect to such advances ("WIP Obligation"). Compass shall, prior to the Effective Date, request that all of its vendors invoice through the Effective Date, and give Compass an estimate of any WIP Obligation that is not invoiced. On the Effective Date Compass shall be paid all amounts due it under this paragraph II.B.(1), but the amounts with respect to the Unpaid Advances and the WIP Obligation shall be paid directly to the third party vendors on the Effective Date. In the event that Compass or the Receiver dispute any portion of the Unpaid Advances or the WIP Obligation, and withhold payment under paragraph II.B.(2) of this Agreement, such disputed amounts shall be held in a segregated account in the joint name of Compass and vendor until such dispute is resolved. The parties presently contemplate, subject to audit, that the accrued servicing fees and servicer advances (with interest), amount to approximately $30 million. The funds to pay such accrued servicing fees and servicer advances are to be provided by the New Servicer, who thereupon shall succeed to Compass's priority position with respect to repayment of such amounts from Loan resolutions, as and when collected. Plaintiff LLCs, the Direct Lenders, and the Receiver shall have no liability or obligation to pay such accrued servicing fees and servicer advances; provided, however, that the payment of such servicing fees and servicer advances on the Effective Date, in an amount agreed upon herein or as modified by a determination by the Court pursuant to paragraph II.B.(2) hereof, is a condition precedent to the effectiveness of this Settlement.

(2) Promptly upon the execution of this Settlement Agreement, Compass shall give the Receiver, or his designee, immediate access to Compass's servicing records to enable the Receiver to audit such accrued servicing fees and servicer advances. This audit shall be for

the purpose of (i) verifying that Compass has calculated the accrued servicing fees in accordance with the numerical percentages stated in the applicable LSAs, as determined by the U.S. Bankruptcy Court in connection with the Confirmation Order; (ii) verifying that the servicer advances as reflected in the amounts paid or incurred by Compass are accurate and in compliance with industry standard, and have in fact been paid or incurred by Compass in connection with servicing the Loans, and not for other purposes. If, as a result of the audit, the Receiver concludes that Compass has calculated the servicing fees in a manner inconsistent with the servicing fee percentages established in the Confirmation Order, or that amounts paid or incurred by Compass through the Effective Date should not be reimbursed or paid as servicer advances under the terms of the LSAs in connection with the Loans, and Compass and the Receiver cannot reach agreement as to the proper amount of the servicing fees and servicer advances as of the Effective Date, then the Receiver shall file with the District Court prior to the Effective Date an objection to the disputed portion of servicing fee or servicer advance setting forth the specific basis for the Receiver's objection. The undisputed portion of the servicing fees and servicer advances shall be paid in full upon the Effective date pursuant to II.B.(1) above, and the Receiver's objection with respect to the disputed portion shall be resolved as soon as possible and paid in full in cash upon determination by the District Court.

**C.    Waterfall Resolution**

(1) In consideration of the dismissals and releases by Defendants as provided herein, Compass shall receive funds to resolve the so-called "waterfall" issue, related to Compass's right to default interest, late fees and other disputed fees. The payment will equal Thirty-Four Million Five Hundred Thousand Dollars ($34,500,000) (the "Waterfall Resolution"). Any default interest, late fees or other disputed fees that are paid to Compass between the date of execution of this Agreement and the Effective Date will reduce the Waterfall Resolution proportionately. The Receiver agrees to use his best efforts to arrange for payment of all or part of such Waterfall Resolution by the New Servicer on the Effective Date. To the extent such payment is not made on the Effective Date, however, the Waterfall Resolution shall be made out

of the proceeds from Loan repayments, as and when collected. The portion of the Waterfall Resolution allocable to a particular Loan shall be established by the Receiver, and approved by Compass, based upon the most current valuation information in the possession of Compass regarding the real property collateral for such Loans, less the outstanding accrued servicing fees and advances on the Effective Date (the "Estimated Net Recovery Value"), and allocated among the Loans based upon the Estimated Net Recovery Value, such that Compass shall be assured of payment in full of the Waterfall Resolution, plus interest, calculated in the manner set forth below. Payment of the Waterfall Resolution from a Loan resolution shall have the same priority of payment as that of the servicing fees accrued and servicer advances incurred by the New Servicer with respect to such Loan, and senior in priority of payment to all other amounts due and owing under the Loan. Interest shall accrue from and after the Effective Date on the unpaid balance of the portion of the Waterfall Resolution allocated to a specific Loan at a rate of 18% per annum, compounded monthly, until paid in full.

(2) In consideration of the dismissals and releases of tort claims by certain Plaintiffs as provided herein, and without admitting any liability therefore, from the $34.5 million Waterfall Resolution described above, and as these amounts are paid to Compass over time, Compass will contribute $6 million to a fund to resolve the tort claims stated against Compass (the "Tort Claim Fund"). As Waterfall Resolution moneys are received by Compass, Compass will contribute to the Tort Claim Fund a portion of the Waterfall Resolution moneys received, in the ratio of 6/34.5, until $6 million has been paid. By way of example, and for the sake of clarity only, if Waterfall Resolution moneys are received by Compass in the amount of $17, Compass will contribute $3 to the Tort Claim Fund, and will keep $14 for its own account. The Tort Claim Fund shall be disbursed among Class Members as ordered by the Court. In addition, if all or part of the $34.5 million Waterfall Resolution under paragraph II.C.(1) hereof is paid at the closing, Compass will contribute an amount to the Tort Claim Fund equal to the same percentage of the Tort Claim Fund that the amount received by Compass is of the Waterfall Resolution amount. For example, if 70% of the Waterfall Resolution amount is paid to Compass

free and clear at the closing ($24,150,000), Compass will contribute free and clear to the Tort Claim Fund 70% of $6 million ($4,200,000).

**D.** **Class Action Procedures**

        (a)      The Receiver shall file a Third Amended Complaint in the Case alleging claims against Defendants on behalf of the Class, which consists of all Direct Lenders under the Loans (the "Class Action Complaint").

        (b)      The Parties shall jointly move the Court to certify the Class under Federal Rule of Civil Procedure 23(b)(1)(A), 23(b)(1)(B), and/or 23(b)(2). The Parties stipulate and agree that the Class primarily seeks injunctive and declaratory relief and that Parties' respective claims for damages (consideration for which is provided by the Tort Claim Fund) are incidental, not central to the overall settlement and do not predominate. Due process does not require, therefore, that the Court provide an opt-out provision for Class Members. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1240 (9th Cir. 1998).

        (c)      The Parties shall recommend acceptance of the Settlement by all necessary persons, and all Class Members.

        (d)      The Parties shall cooperate in applying to the District Court for orders necessary to effectuate the class settlement, including but not limited to an order: (i) preliminarily and finally approving the Settlement, (ii) authorizing notice of the Settlement to the members of the Class, giving such class members the opportunity to object to the Settlement, and approving the form and content of such notice (iii) certifying the Class for settlement purposes only, and (iv) scheduling a Final Settlement Hearing for the District Court to determine whether to finally approve and implement the terms of this Settlement.

(e)    Solely for purposes of this Settlement, the Parties stipulate and agree to the certification of a Class consisting of the Class Members.  If the Effective Date of this Settlement does not occur, the fact that the Parties were willing to stipulate to class certification as part of the Settlement shall have no bearing on, nor be admissible in connection with, the issue of whether a class should be certified in a non-settlement context, and the Parties reserve all rights to object to maintenance of the actions as class actions in such non-settlement circumstances.

(f)    Should the Court, or any other court taking jurisdiction of this matter, decline to approve all material aspects of the Settlement, refuse to conditionally certify the Settlement Class for purposes of this Settlement substantially as defined in this Settlement Agreement (although insubstantial differences of wording of the ultimate definition of the Settlement Class shall have no effect on this Settlement Agreement), fail to grant final approval of the Settlement, or for any reason not enter Judgment in this Litigation, none of the Parties shall be bound by this Settlement Agreement, which shall thereupon expire and have no further force or effect.

(g)    The Parties stipulate and agree that the Settlement as set forth in this Settlement Agreement and its terms are fair, just, reasonable, adequate and equitable as to the Class and the Defendants, are consistent with public policy, and fully comply with applicable provisions of law.

## E.    <u>Dismissals of Litigation</u>

Upon the Effective Date, the Cases, and all claims, demands and causes of action that were or could have been alleged in the Cases, shall be dismissed with prejudice.  Such dismissals shall include dismissals of the Class Action Complaint, the Adversary Proceeding, and the

Cross-Complaint. Such dismissals shall be with prejudice. The Court shall, however, retain jurisdiction to enforce the Settlement and to supervise the Receiver who was appointed for the LLCs.

**F.**    **Mutual Releases**

(a)    **Releases by Class Members**. Each Class Member, on behalf of himself and any person or entity claiming by and through him, shall release Defendants, and their respective agents, attorneys, employees, representatives, members, advisors, officers, directors, shareholders, partners, insurers, affiliates, successors, assigns, and transferees, from any and all claims, demands and causes of action of any kind, nature or description whatsoever, known or unknown, through the date of final approval of the Settlement, and from any and all liabilities, damages, injuries, actions whether in law or in equity, which such Class Member now holds or has asserted, or in the future may hold or may assert relating in any way to the allegations and claims set forth in the Class Action Complaint, the Adversary Proceeding, the Cross-Complaint, the Cases, the Loans, the servicing fees, the servicer advances, the LSAs, Compass's acquisition of assets of USACM and USA Capital First Trust Deed Fund, LLC from the chapter 11 bankruptcy cases pending for those entities and certain affiliates in the United States Bankruptcy Court for the District of Nevada, or Compass's actions related to the Loans, including Compass's acts as Servicer under the LSAs.

(b)    **Releases by Defendants**. Defendants, on behalf of themselves and any person or entity claiming by and through them, hereby release each Class Member, the Plaintiff LLCs, the Non-LLC Plaintiffs, the Receiver, and their respective agents, attorneys, employees, representatives, members, advisors, officers, directors, shareholders,

partners, insurers, affiliates, successors, assigns, and transferees, from any and all claims, demands and causes of action of any kind, nature or description whatsoever, known or unknown, through the date of preliminary approval of the Settlement, and from any and all liabilities, damages, injuries, actions whether in law or in equity, which such Defendants, or any of them, now holds or has asserted, or in the future may hold or may assert, relating in any way to the allegations and claims set forth in the Class Action Complaint, the Adversary Proceeding, the Cross-Complaint, the Cases, the Loans, the servicing fees, the servicer advances, the LSAs, Compass's acquisition of assets of USACM and USA Capital First Trust Deed Fund, LLC from the chapter 11 bankruptcy cases pending for those entities and certain affiliates in the United States Bankruptcy Court for the District of Nevada, Compass's actions related to the Loans, including Compass's acts as Servicer under the LSAs, and the formation of the LLCs, any motion for contempt filed in the Cases.

(c)     The Parties and the Class Members stipulate and agree that each of them has, and by operation of the Settlement Agreement shall be deemed to have, expressly waived the provisions, rights and benefits of California Civil Code §1542, or any similar provision in any other jurisdiction. California Civil Code §1542 provides as follows: "**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**" The Parties expressly waive any and all provisions, rights and benefits conferred by any law of any state or territory of the

United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542. The releases granted herein are specifically intended to be and are general releases of, and are intended to include and do include, claims that the Parties might not now know or expect to exist in their respective favors at the date hereof, even if knowledge of such claims might have otherwise materially affected the granting of the releases. Even if the Plaintiffs and/or the Class Members or Defendants hereafter may discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of the Class Members' or Defendants' Released Claims each Plaintiff and Class Member, and each Defendant, upon the Effective Date, shall be deemed to have and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all of Class Members' and Defendants' Released Claims which now exists, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, international, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts. This is true whether Class Members' or Defendants' Released Claims are known or unknown, suspected or unsuspected, contingent or non-contingent and, whether or not those claim have been concealed or hidden.

### G.    Standstill Agreement

The Standstill Period (as defined in that certain letter agreement, dated January 18, 2008, as amended) shall be extended through and including the date of the hearing on final approval of the Settlement Agreement and the class certification sought in connection with the Class Action Complaint. This amended Standstill Period shall apply to the Cases, including the hearing on

termination of Compass's servicing rights previously scheduled to commence August 12, 2008. The Court has continued that hearing by 70 days.

**H.      Disbursement of 1% Funds**

The Parties hereby consent and agree that, subject to approval of the District Court, funds in the amount of 1% of the current outstanding principal investment of Direct Lenders (as of the date the LLCs were formed) who were identified as members of the Plaintiff LLCs that have been or through the Effective Date will be collected by Compass from a Loan resolution (the "1% Assessment") and held in escrow by Compass and/or Silar pursuant to District Court Order as a fund to pay certain of Plaintiffs' litigation costs and expenses, shall be paid to the Receiver, to be held by him and disbursed in accordance with orders of the District Court. The Parties further agree that, subject to approval of the Court, the 1% Assessment collected by the New Servicer after the Effective Date from Loan resolutions shall be paid to the Receiver, to be held by and disbursed in accordance with further orders of the Court. The award of fees or costs to the Receiver or Class Counsel is not a condition to the effectiveness of this settlement. However, the Receiver and Class Counsel reserve the right to apply to the Court for an award of reasonable fees and costs to be paid out of: (i) present and future amounts paid pursuant to the 1% withhold described above and/or (ii) amounts of loan resolutions received by the loan servicer in the future, or (iii) in such manner as the Court directs. The Receiver and Class Counsel will not seek to recover such fees and costs from Compass, and recovery of any fees and costs awarded by the Court will not take priority over the payments due Compass pursuant to this Agreement.

**I.      Notice of Proposed Settlement**

(a)      After the Court orders preliminary approval of this Settlement, and on such date as the Court may determine, the Receiver shall mail the following documents to each Class Member: Notice of the Settlement and Opportunity to Object.

(b)      The Notice of Settlement and Opportunity to Object shall fairly inform the Class Members of the general nature of the Cases,

the time and place of the fairness hearing held by the Court, the time and methods allowed for objecting to the Proposed Settlement, and the financial and other terms of this proposed Settlement particularly significant for the Class Members. The Notice of Settlement and Opportunity to Object shall provide, inter alia, that: (a) in order to object to this Settlement or any term of it, the person making the objection must be a Class Member and must, within thirty (30) days after the Notice of Proposed Settlement was mailed to the objecting Class Member, file with the Court and serve on Plaintiffs' Counsel and Defendants' counsel, a written statement of the grounds of objection, signed by the objecting Class Member or his or her attorney, along with all supporting paper; (b) the date of mailing of the Notice of Settlement and Opportunity to Object to the objecting Class Member shall be conclusively determined according to the records of the Receiver; (c) any objection that does not meet the requirements of the notice is paragraph shall not be considered by the Court; and (d) Class Members who fail to timely file and serve objections in the manner specified herein shall be deemed to have waived said objections.

(c) The Receiver shall provide to the Court, at least five (5) days prior to the Final Settlement Hearing, a declaration of due diligence and proof of mailing with regard to the mailing of the Notice and attempts to locate Class Members.

**J.** **No Person Shall Have Any Claim Against Party**

No person shall have any claim against any Defendant, any attorney for any Defendant, Plaintiffs, any Class Member, any attorney for Plaintiffs, or the Receiver based on distributions or payments made in accordance with this Settlement Agreement.

**K.** **Retention of Jurisdiction**

Even after the dismissals provided for herein, the Court shall have and retain continuing jurisdiction over the Cases and over all Parties and Class Members, to the fullest extent necessary or convenient to enforce and effectuate the terms and intent of this Settlement Agreement and all matters provided for in it, and to interpret it, and to supervise the Receiver appointed for the LLCs.

## III.   MUTUAL FULL COOPERATION

The Parties agree to fully cooperate with each other to accomplish the terms of this Settlement Agreement, including but not limited to, executing such documents and taking such other action as may reasonably be necessary to implement the terms of this Settlement Agreement. The Parties to this Settlement Agreement shall use their best efforts, including all efforts contemplated by this Settlement Agreement and any other efforts that may become necessary by order of the Court, or otherwise, to effectuate this Settlement Agreement and the terms set forth herein. The Parties shall take all necessary steps to secure the Court's final approval of this Settlement Agreement and the class settlement sought in connection with the Class Action Complaint

## IV.   NO ADMISSIONS

The Parties have agreed to enter into this Settlement Agreement in order to put to rest all controversy and to avoid further expense and burdensome, protracted and costly litigation which would be involved in defending against all the claims raised in Cases and related claims, without in any way acknowledging any fault or liability; and each Party has denied and continues to deny all charges of wrongdoing or liability whatsoever asserted or which could have been asserted in this action. Nothing contained in this Settlement Agreement may be used or construed by any person or entity as an admission of liability by any other person or entity with respect to any monetary, equitable or any other relief whatsoever, and this Settlement Agreement, whether approved or not, shall not be offered or received in evidence in any action or proceeding in any court or other tribunal as an admission or concession of liability or wrongdoing of any nature on the part of any Party or Class Member.

LA1:#6383537v13

-16-

## V.    GENERAL PROVISIONS

### A.    Entire Agreement

This Settlement Agreement constitutes the entire agreement between the Parties relating to the Settlement of this action, and no representations, warranties or inducements have been made to any Party concerning this Settlement Agreement other than the representations, warranties and covenants contained and memorialized in this Settlement Agreement.

### B.    Authorization to Act

Counsel for Plaintiff LLCs warrant and represent that they are authorized by the Receiver, and counsel of record for Defendants warrant that they are authorized by their respective Defendant clients, to take all appropriate action required or permitted to be taken by such Parties pursuant to this Settlement Agreement to effectuate its terms, and to execute any other documents required to effectuate the terms of this Settlement Agreement, except for any documents, including but not limited to this Settlement Agreement, that are required to be executed by the Parties.

### C.    Modification Only in Writing

This Agreement may be amended or modified only by a written instrument signed by all Parties (or their successors in interest) and attorneys for Defendants and the attorneys for the class that executed the Agreement.

### D.    Binding on Predecessors, Successors and Assigns

This Settlement Agreement shall be binding upon, and inure to the benefit of, the predecessors, successors and assigns of the Parties and Class Members.

### E.    No Prior Assignments

The Parties hereto represent, covenant, and warrant that they have not directly or indirectly assigned, transferred, encumbered, or purported to assign, transfer, or encumber to or in favor of any person or entity any portion of any liability, claim, demand, cause of action or rights herein released and discharged except as set forth herein.

F.    **Governing Law**

All terms of this Settlement Agreement shall be governed by and interpreted according to the laws of the State of Nevada, without giving effect to conflict of laws principles.

G.    **Counterparts and Fax Signatures**

This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument provided that counsel for the Parties shall exchange original signed counterparts.  A fax signature on this Settlement Agreement shall be as valid as an original signature.

H.    **Headings For Convenience Only**

The headings of any paragraphs or sections of this Settlement Agreement are inserted for convenience of reference only and shall not be considered in interpreting this Settlement Agreement.

I.    **Construction of This Agreement**

The Parties hereto agree that the terms and conditions of this Settlement Agreement are the result of lengthy, intensive, arms-length negotiations between the Parties and that this Settlement Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party, or his, her or its counsel participated in the drafting of this Settlement Agreement.

J.    **No Extensions of Time for Mailing or Overnight Services**

No deadline or time period provided for in this Settlement Agreement shall be extended on the grounds of transmission by mail or by any overnight delivery company or services, except as otherwise specifically provided for in this Settlement Agreement.

K.    **Signatory Entities**

Any person executing this Settlement Agreement or any related document on behalf of a signatory that is a corporation, entity or organization hereby warrants and promises for the benefit of all Parties hereto that he or she has been duly authorized by such corporation, entity or

organization to execute this Settlement Agreement on behalf of such corporation, entity or organization.

Dated: July 24, 2008

_____
Thomas Grimmett as Receiver For

    3685 SAN FERNANDO LENDERS, LLC, a Nevada limited liability company, 5055 COLLWOOD LENDERS, LLC, a Nevada limited liability company, 6425 GESS LENDERS, LLC, a Nevada limited liability company, 60th STREET VENTURES LENDERS, LLC, a Nevada limited liability company, AMESBURY HATTERS PT LENDERS, LLC, a Nevada limited liability company, ANCHOR B LENDERS, LLC, a Nevada limited liability company, BAR-USA LENDERS, LLC, a Nevada limited liability company, BAY POMPANO LENDERS, LLC, a Nevada limited liability company, BINFORD LENDERS, LLC, a Nevada limited liability company, BROOKMERE LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 2.5 LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 5.0 LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 5.725 LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 7.5 LENDERS, LLC, a Nevada limited liability company, CABERNET LENDERS, LLC, a Nevada limited liability company, CASTAIC II LENDERS, LLC, a Nevada limited liability company, CASTAIC III LENDERS, LLC, a Nevada limited liability company, CHARLEVOIX LENDERS, LLC, a Nevada limited liability company, CLEAR CREEK PLANTATION LENDERS, LLC, a Nevada limited liability company, COM VEST LENDERS, LLC, a Nevada limited liability company, COPPER SAGE II LENDERS, LLC, a Nevada limited liability company, CORNMAN TOLTEC LENDERS, LLC, a Nevada limited liability company, DEL VALLE LIVINGSTON LENDERS, LLC, a Nevada limited liability company, EAGLE MEADOWS LENDERS, LLC, a Nevada limited liability company, FIESTA MURIETTA LENDERS, LLC, a Nevada limited liability company, FIESTA USA STONERIDGE LENDERS, LLC, a Nevada limited liability company, FOX HILLS 216 LENDERS, LLC, a Nevada limited liability company, GRAMERCY COURT LENDERS, LLC, a Nevada limited liability company, HARBOR GEORGETOWN LENDERS, LLC, a

Nevada limited liability company, HESPERIA LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE I LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE II LENDERS, LLC, a Nevada limited liability company, HUNTSVILLE LENDERS, LLC, a Nevada limited liability company, LA HACIENDA LENDERS, LLC, a Nevada limited liability company, LAKE HELEN PARTNERS LENDERS, LLC, a Nevada limited liability company, LERIN HILLS LENDERS, LLC, a Nevada limited liability company, MARGARITA ANNEX LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE I LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE II LENDERS, LLC, a Nevada limited liability company, MOUNTAIN HOUSE-PEGS LENDERS, LLC, a Nevada limited liability company, OAK SHORES II LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 2.75 LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 9.425 LENDERS, LLC, a Nevada limited liability company, PALM HARBOR I LENDERS, LLC, a Nevada limited liability company, SHAMROCK TOWER LENDERS, LLC, a Nevada limited liability company, SO CAL LAND LENDERS, LLC, a Nevada limited liability company, STANDARD PROPERTY HOLDINGS, LLC, a Nevada limited liability company, TAPIA RANCH LENDERS, LLC, a Nevada limited liability company, TEN NINETY 4.15 LENDERS, LLC, a Nevada limited liability company, THE GARDENS 2.425 LENDERS, LLC, a Nevada limited liability company, THE GARDENS LLC TSHR LENDERS, LLC, a Nevada limited liability company.

Dated: July ___, 2008

_____
Janet L. Chubb On Behalf Of
Attorneys for Mojave Canyon, Inc., Charles B. Anderson Trust, Rita P. Anderson Trust, Baltes Company, Robert J. Kehl and Ruth Ann Kehl, Daniel J. Kehl, Kehl Development Corporation, Kevin A. Kehl, Kevin Kehl as Guardian of Susan L. Kehl, Kevin Kehl as Guardian of Andrew Kehl, Robert A. Kehl and Tina M. Kehl, Krystina L. Kehl, Christina M. Kehl, Warren Hoffman Family Investments, LP, Judy A. Bonnet, Kevin McKee, Patrick J. Anglin, and Cynthia Winter

Dated: July 23, 2008

COMPASS FINANCIAL PARTNERS LLC

By: _____

Printed Name: LEONARD MEZEI

Dated:  July **23**, 2008

Title: _MEMBER_

COMPASS USA SPE LLC

By: _____

Printed Name: _LEONARD MEZEI_

Title: _MEMBER_

Dated:  July ___, 2008

SILAR ADVISORS LP

By:_____

Printed Name:_____

Title:_____

Dated:  July ___, 2008

SILAR SPECIAL OPPORTUNITIES FUND L?

By:_____

Printed Name:_____

Title:_____

Dated:  July **24**, 2008

DAVID BLATT

Dated:  July ___, 2008

BORIS PISKUN

Dated: July 23, 2008

Title: *MEMBER*

COMPASS USA SPE LLC

By: _____

Printed Name: *LEONARD MEZEI*

Title: *MEMBER*

Dated: July ___, 2008

SILAR ADVISORS LP

By: _____

Printed Name: _____

Title: _____

Dated: July ___, 2008

SILAR SPECIAL OPPORTUNITIES FUND LP

By: _____

Printed Name: _____

Title: _____

Dated: July ___, 2008

DAVID BLATT

Dated: July 24, 2008

_____

BORIS PISKUN

Nevada limited liability company, HESPERIA LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE I LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE II LENDERS, LLC, a Nevada limited liability company, HUNTSVILLE LENDERS, LLC, a Nevada limited liability company, LA HACIENDA LENDERS, LLC, a Nevada limited liability company, LAKE HELEN PARTNERS LENDERS, LLC, a Nevada limited liability company, LERIN HILLS LENDERS, LLC, a Nevada limited liability company, MARGARITA ANNEX LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE I LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE II LENDERS, LLC, a Nevada limited liability company, MOUNTAIN HOUSE-PEGS LENDERS, LLC, a Nevada limited liability company, OAK SHORES II LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 2.75 LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 9.425 LENDERS, LLC, a Nevada limited liability company, PALM HARBOR I LENDERS, LLC, a Nevada limited liability company, SHAMROCK TOWER LENDERS, LLC, a Nevada limited liability company, SO CAL LAND LENDERS, LLC, a Nevada limited liability company, STANDARD PROPERTY HOLDINGS, LLC, a Nevada limited liability company, TAPIA RANCH LENDERS, LLC, a Nevada limited liability company, TEN NINETY 4.15 LENDERS, LLC, a Nevada limited liability company, THE GARDENS 2.425 LENDERS, LLC, a Nevada limited liability company, THE GARDENS LLC TSHR LENDERS, LLC, a Nevada limited liability company.

Dated: July 25, 2008

_Refer to Page 22 jlc_

Janet L. Chubb On Behalf Of
Attorneys for Mojave Canyon, Inc., Charles B. Anderson Trust, Rita P. Anderson Trust, Baltes Company, Robert J. Kehl and Ruth Ann Kehl, Daniel J. Kehl, Kehl Development Corporation, Kevin A. Kehl, Kevin Kehl as Guardian of Susan L. Kehl, Kevin Kehl as Guardian of Andrew Kehl, Robert A. Kehl and Tina M. Kehl, Krystina L. Kehl, Christina M. Kehl, Warren Hoffman Family Investments, LP, Judy A. Bonnet, Kevin McKee, Patrick J. Anglin, and Cynthia Winter

Dated: July ___, 2008

COMPASS FINANCIAL PARTNERS LLC

By:_____

Printed Name:_____

LA1:#6383537v13

-20-

Dated: July 25, 2008

I certify that I have participated in the mediation of this matter and I can recommend the settlement embodied in this Settlement Agreement. I do not, however, sign this document on behalf of or binding my clients, who retain the same rights under the class action procedures as do all Direct Lenders.

_____
Janet L. Chubb

# SETTLEMENT AGREEMENT
# EXHIBIT A

# SETTLEMENT AGREEMENT
# EXHIBIT A

Exhibit "A"

1.  3685 San Fernando
2.  5505 Collwood
3.  6425 Gess
4.  60th Street Venture
5.  Amesbury Hatters Point
6.  Anchor B
7.  BarUSA
8.  Bay Pompano
9.  Binford
10. Brookmere
11. Bundy Canyon $2.5 MM
12. Bundy Canyon $5.0 MM
13. Bundy Canyon $5.725 MM
14. Bundy Canyon $7.5 MM
15. Cabernet
16. Castaic II
17. Castaic III
18. Charlevoix
19. Clear Creek Plantation
20. Comvest
21. Copper Sage II
22. Cornman Toltec
23. Del Valle Livingston
24. Eagle Meadows
25. Fiesta Murrieta
26. Fiesta Stoneridge
27. Foxhills 216
28. Gramercy Court
29. Harbor Georgetown
30. Hesperia
31. HFA Clearlake I
32. HFA Clearlake II
33. Huntsville
34. La Hacienda
35. Lake Helen Partners
36. Lerin Hills
37. Margarita Annex
38. Marlton Square I
39. Marlton Square II
40. Mountain House-Pegs
41. Oak Shores II
42. Ocean Atlantic $2.75 MM
43. Ocean Atlantic $9.425 MM

LAI:#6384951v1

44. Palm Harbor I
45. Shamrock Tower
46. SoCal Land Development
47. Standard Property
48. SVRB $2.325 MM
49. SVRB $4.5 MM
50. Tapia Ranch (Castaic I)
51. Ten-Ninety $4.15 MM
52. The Gardens $2.425 MM
53. The Gardens Timeshare